UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                     Case No. 23-CR-008

KEVIN MCCAA,

        Defendant.

## GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANT'S MOTIONS

The United States of America, by its attorneys, Gregory J. Haanstad, United States Attorney for the Eastern District of Wisconsin, and Margaret B. Honrath and Abbey M. Marzick, Assistant United States Attorneys, hereby respond to defendant Kevin McCaa's pretrial motions. ECF 56 & 57. For the reasons set forth below, both of the defendant's motions should be denied.

## PROCEDURAL BACKGROUND

On January 18, 2023, a federal grand jury in the Eastern District of Wisconsin returned a seven-count indictment charging defendant Kevin McCaa in three counts with first-degree intentional homicide of a postal carrier (Count One), discharge of a firearm during a crime of violence (Count Two), and felon in possession of ammunition (Count Four). ECF 23. The government has been following the Expanded Discovery Policy defined in Criminal L. R. 16(a)(2), and the majority of the discovery was disclosed to McCaa on February 7, 2023. The case was designated complex due to the volume of discovery. ECF 39. A trial date has not yet been set.

On October 20, 2023, defendant McCaa filed a Motion to Dismiss Count Four based upon Second Amendment grounds (ECF 56) and a Motion for Early Disclosure of Other Acts Evidence, Expert Notice, and Other Evidence (ECF 57).[1] This Court should deny both of McCaa's motions.

## MCCAA'S MOTION TO DISMISS COUNT FOUR ON SECOND AMENDMENT GROUNDS (ECF 56)

McCaa filed a motion to dismiss Count Four contending that under *New York State Rifle & Pistol Ass'n v. Bruen,* 142 S. Ct. 2111 (2022), 18 U.S.C. § 922(g)(1) is unconstitutional under the Second Amendment. ECF 56. McCaa's constitutional claim is without merit, whether construed as a facial challenge or as applied to him. Since the Supreme Court decided *Bruen* in June 2022, the Government is aware of approximately 400 federal district and circuit court decisions considering the constitutionality of felon-disarmament; all but approximately 10 have found felon-disarmament constitutional under the Second Amendment. *See, e.g., United States v. Watson*, No. 23-cr-109, Dkt. 25, at 11 (E.D. Wis. Oct. 11, 2023) (noting near-unanimous case law and finding Section 922(g)(1) constitutional) (Griesbach, J.); *United States v. Johnson*, 2023 WL 7284848 (E.D. Wis. Nov. 3, 2023) (same) (Adelman, J.). Consistent with this substantial persuasive authority, this Court should deny McCaa's motion and hold that § 922(g)(1) remains constitutional.

## I.    FACTUAL BACKGROUND

On December 9, 2022, a United States Postal Carrier was shot in the head and killed while delivering mail in Milwaukee, Wisconsin. ECF 1. Based upon ballistics testing, the homicide weapon was a Glock 19 Gen 4 9mm semi-automatic handgun, which was found submerged under water in a creek that corresponds to the homicide suspects' flight path. *Id.* A coordinated investigation by the Milwaukee Police Department, United States Postal Inspection Service, and

---

[1] Defendant McCaa also filed an Unopposed Motion to Preserve a Bruton/Severance Motion. ECF 58.

Federal Bureau of Investigation led to the execution of search warrants at several residences on December 27, 2023, including Kevin McCaa's residence on W. Eggert Street in Milwaukee, Wisconsin, and McCaa's girlfriend's residence on W. Grantosa Drive in Milwaukee, Wisconsin. From one of the bedrooms at McCaa's Eggert residence, along with identifiers for McCaa and clothing items consistent with clothing McCaa had worn the night of the homicide, officers recovered multiple rounds of 9mm ammunition. In addition, from the Grantosa residence where McCaa was located and arrested, officers recovered two Glock firearm magazines and multiple rounds of ammunition.

McCaa was prohibited under § 922(g)(1) from possessing ammunition because he was previously convicted of multiple felonies in Milwaukee County Circuit Court, including Fleeing or Eluding an Officer (Case No. 2018CF537, sentenced to one year at the House of Corrections, imposed and stayed, and 2 years of probation) and Possession of THC 2nd offense (Case Nos. 2005CF2116, 2009CF493, 2009CF2996, and 2011CF2835). At the time of the homicide, McCaa also had two open felony cases in Milwaukee County Circuit Court: one involving allegations that McCaa fled from police while in possession of a firearm (Case No. 2021CF charges include: Second Degree Recklessly Endangering Safety; Possession of Firearm – Convicted of a Felony; and Fleeing/Eluding); and another involving allegations that McCaa shot a 15-year-old in the head (Case No. 2022CF2487, charges include: First Degree Recklessly Endangering Safety; Second Degree Recklessly Endangering Safety; and Possession of Firearm – Convicted of a Felony).

## II. LEGAL BACKGROUND

### A. The Supreme Court's Precedent

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that the Second

Amendment guarantees the right of "law-abiding, responsible citizens" to keep and bear arms for self-defense. 554 U.S. 570, 635 (2008). Consistent with that interpretation, the Court cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," and it described those restrictions as "presumptively lawful regulatory measures." *Id.* at 626, 627 n.26. The Court incorporated that understanding into its holding, ruling that the plaintiff was entitled to possess a handgun only if he was "not disqualified from the exercise of Second Amendment rights"—meaning, among other things, that he was "not a felon" and was "not insane." *Id.* at 631, 635. The Court stated that those "exceptions" to the Second Amendment had "historical justifications," which the Court would have "time enough to expound upon" "if and when those exceptions come before" it. *Id.* at 635.

In approving felon-disarmament laws, the *Heller* Court adopted a position that had been urged by the plaintiff, many of his *amici*, and the United States. The plaintiff assured the Court that, although the Second Amendment secured an individual right to keep and bear arms, "basic firearm safety laws," such as the "prohibition on possession of guns by felons," would "easily" pass constitutional muster. Resp. Br. at 57, *Heller*, *supra* (No. 07-290). Many amici who supported the plaintiff similarly assured the Court that "bans on ownership by felons" are among the "many valid restrictions on the right to keep and bear arms," NRA Amicus Br. at 22, *Heller*, *supra* (No. 07-290), and that laws disarming "convicted felons" are "consistent with centuries of common law," Texas Amicus Br. at 35, *Heller, supra* (No. 07-290). And the United States devoted a section of its amicus brief to marshalling "historical evidence" that the right to keep and bear arms "simply does not extend to felons." U.S. Amicus Br. at 25-26, *Heller, supra* (No. 07-290).

In embracing the same view, the Court's decision in *Heller* "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws * * * prohibiting possession by felons." *NYSRPA v. City of New York*, 140 S. Ct. 1525, 1540-1541

(2020) (Alito, J., dissenting). Or, as then-Judge Kavanaugh put it, "the Court in *Heller* affirmatively approved * * * felon-in-possession laws * * * based on a history-and-tradition-based test." *Heller v. District of Columbia*, 670 F.3d 1244, 1278 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

The Supreme Court's decision in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), reaffirmed that understanding of the Second Amendment. The plurality observed that the Court had "made it clear in *Heller* that [its] holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill.'" *Id.* at 786 (citation omitted). The *McDonald* plurality "repeat[ed] those assurances." *Ibid.*

In *Bruen*, the Supreme Court revisited the Second Amendment, explaining that it protects the right of "law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." 142 S. Ct. at 2156. In so doing, *Bruen* struck down a New York law requiring residents to demonstrate a "proper cause" to obtain a license to carry a handgun outside the home. *Id.* The *Bruen* Court repeatedly used the term "law-abiding citizen" to describe the class of persons protected by the Second Amendment. *See id.* at 2122 ("ordinary, lawabiding citizens"); *id.* at 2125 ("law-abiding, adult citizens"); *id.* at 2131 ("law-abiding, responsible citizens") (citation omitted); *id.* at 2133 ("a law-abiding citizen's right to armed self-defense" and "law-abiding citizens"); *id.* at 2134 ("ordinary, law-abiding, adult citizens"); *id.* at 2135 n.8 ("law-abiding citizens"); *id.* at 2138 ("law-abiding citizens"); *id.* at 2138 n.9 ("lawabiding, responsible citizens") (citation omitted); *id.* at 2150 ("law-abiding citizens"); *id.* at 2156 ("law-abiding, responsible citizens" and "law-abiding citizens"). And Justice Kavanaugh's concurrence repeated *Heller*'s statement that

"prohibitions on the possession of firearms by felons" are "presumptively lawful regulatory measures." *Id*. at 2162 (Kavanaugh, J., concurring) (brackets and citation omitted).

*Bruen* articulated a revised analytical framework for determining whether a modern firearm regulation is constitutional, directing courts to assess whether such regulations "are consistent with the Second Amendment's text and historical understanding." *Id.* First, it said, the court must decide whether "the Second Amendment's plain text covers an individual's conduct." *Id.* If so, then "the Constitution presumptively protects that conduct." *Id.* at 2130. The analysis then moves to the second step, which calls on the "government [to] justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* "The Court predicted that this second step would be relatively easy in some instances, when historical analogues are easy to find." *Bevis v. City of Naperville, IL*, __ F. 4th __, 2023 WL 7273709, *9 (7th Cir. Nov. 3, 2023). "But in other instances, it recognized that the task would be challenging." *Id. Bruen* recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." 142 S. Ct. at 2132. Where there is no such straightforward correspondence—for example, where "unprecedented societal concerns or dramatic technological changes" are implicated—*Bruen* explained that "a more nuanced approach" is required. *Id.* In these scenarios, *Bruen* directed courts to consider "historical analogies" to the challenged law to determine whether it resembles historically acceptable restrictions. *Id.*

*Bruen* further explained: "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* (quoting C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)). And while *Bruen* did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," it

directed courts to treat as "*central* considerations," "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2132-33 (emphasis in original) (cleaned up); *see also id.* at 2133 ("*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense"). *Bruen* continued:

> To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted. On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Id.* at 2133 (emphases in original) (cleaned up).

Many aspects of the Supreme Court's Second-Amendment jurisprudence rest on the premise that the Second Amendment protects only law-abiding citizens, not felons. In judging whether modern firearms regulations are consistent with their historical precursors, courts must ask "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. In judging whether the Second Amendment protects particular types of weapons, courts must consider whether those weapons are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. And the government may require gun owners to pass background checks—which include a check for felony convictions— because such checks ensure that those who carry guns "are, in fact, 'law-abiding, responsible citizens.' " *Bruen*, 142 S. Ct. at 2138 n.9 (citation omitted).

### B. Under *Bruen's* Framework, the Overwhelming Majority of Federal Courts Have Upheld § 922(g)(1) as Constitutional.

Since *Bruen*, nearly every federal district and circuit court to have addressed the constitutionality of § 922(g)(1)—in approximately 400 separate rulings—has concluded that the

statute remains constitutional. In this district, Judges Griesbach and Adelman have reached the same conclusion.

The Seventh Circuit has yet to resolve the question since *Bruen,* but the Eighth Circuit recently upheld the constitutionality of § 922(g)(1) under *Bruen*'s text and history test. *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023). Addressing an as-applied challenge to § 922(g)(1)'s constitutionality brought by a defendant convicted of state-law felonies for selling controlled substances, *Jackson* explained that *Bruen* "did not disturb" the Supreme Court's prior "assurances" that *Heller* and *McDonald* did not cast doubt on felon-dispossession laws; that "there is considerable support in the historical record" for a legislature's authority "to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society" as well as those who are "deemed more dangerous than a typical law-abiding citizen"; and that history "supports the constitutionality of § 922(g)(1) as applied to Jackson and other convicted felons, because the law is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 501-06; *see also, e.g., Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023) (holding that nothing in *Bruen* required the court to overturn its previous decisions upholding § 922(g)(1)).

The Ninth Circuit also has recognized a "history and tradition of regulating the possession of firearms" in deciding a challenge to the constitutionality of Sentencing Guideline § 2D1.1(b)(1), which increases the base offense by two levels "[i]f a dangerous weapon (including a firearm) was possessed" during a drug offense. *See United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023). After reviewing relevant historical analogues, *Alaniz* held that the Guideline was constitutional under the Second Amendment because there is "a longstanding tradition of enhancing a defendant's sentence for the increased risk of violence created by mere possession of a firearm during the commission of certain crimes" and that "drug trafficking fits squarely within that category of crimes." *Id.* at 1130. *See also United States v. Hickcox*, No. 22-50365, 2023 WL

3075054, at *1 (5th Cir. Apr. 25, 2023) (on plain-error review, rejecting *Bruen*-based challenge to § 922(g)(1)'s constitutionality "because it is not clear that *Bruen . . .* dictates such a result"); *United States v. Garza*, No. 22-51021, 2023 WL 4044442, at *1 (5th Cir. June 15, 2023) (same).[2]

To be sure, not all courts have held § 922(g)(1) constitutional post-*Bruen*. The most notable such outlier is *Range v. Garland*, in which the Third Circuit, sitting en banc, held the statute unconstitutional as applied to an individual with a disqualifying 1995 prior conviction. 69 F.4th 96 (3d Cir. 2023). *Range* "reject[ed] the Government's contention that only 'law-abiding, responsible citizens' are counted among 'the people' protected by the Second Amendment." *Id.* at 103. It further held "the Government has not shown that our Republic has a longstanding history and tradition of depriving *people like Range* of their firearms." *Id.* at 106 (emphasis added). *Range* emphasized that its "decision today is a narrow one," applying "only" to plaintiff Range "given his violation of" a Pennsylvania misdemeanor statute criminalizing the making of a false statement to obtain food stamps. *Id.* McCaa's motion seizes on the outlier-holding in *Range*. ECF 56 at 3, 6-9, 11-12.

## C. The Seventh Circuit's Decision in *Atkinson v. Garland.*

On June 20, 2023, the Seventh Circuit issued a 2-1 opinion in *Atkinson v. Garland*, which involved an as-applied challenge to § 922(g)(1)'s constitutionality brought in a civil matter by a

---

[2] Post-*Bruen*, federal appeals courts also have upheld other firearms regulations. In *United States v. Sitladeen*, the Eighth Circuit upheld § 922(g)(5)(A) because "unlawful aliens are not part of 'the people' to whom the protections of the Second Amendment extend." 64 F.4th 978, 987 (8th Cir. 2023). In *National Rifle Ass'n v. Bondi*, the Eleventh Circuit upheld a Florida law requiring the purchaser of a gun to be 21 years old because the "law is consistent with our Nation's historical tradition of firearm regulation," *see* 61 F.4th 1317, 1320 (11th Cir. 2023), although that court later vacated the *Bondi* panel opinion after granting a petition for rehearing en banc, *see* 2023 WL 4542153 (11th Cir. July 14, 2023). The government recognizes that in *United States v. Rahimi*, the Fifth Circuit held unconstitutional § 922(g)(8)—which makes it unlawful to possess a firearm if under a court order related to domestic violence. 61 F.4th 443, 461 (5th Cir. 2023) (describing such a ban as an "outlier[] that our ancestors would never have accepted"). On June 30, 2023, the Supreme Court granted certiorari in *Rahimi. See* 2023 WL 4278450. The government further recognizes that the Fifth Circuit also has held unconstitutional, on an as-applied basis, § 922(g)(3), which criminalizes the possession of firearms by "unlawful users" of a controlled substance. *See United States v. Daniels*, 2023 WL 5091317 (5th Cir. Aug. 9, 2023).

plaintiff with a felony mail-fraud conviction. 70 F.4th 1018 (7th Cir. 2023). *Atkinson* left entirely open the question of whether § 922(g)(1) remains constitutional after *Bruen*. Instead, because the district court in *Atkinson* had dismissed the complaint before *Bruen* was decided—and, as a result, without applying *Bruen's* "text and history" test—the panel majority in *Atkinson* remanded the matter "to allow the district court to undertake the *Bruen* analysis in the first instance." *Id.* at 1020.

The panel majority further noted that the parties' appellate briefing also did "not grapple with *Bruen*." *Id.* at 1022.[3] It remanded with instructions that the government further "develop its contention that the plain text of the Second Amendment does not protect felons and other offenders impacted by § 922(g)(1)" and "conduct a more substantial historical analysis." *Id.* at 1020-24. Even more specifically, the panel majority directed the parties to consider a series of "interrelated and non-exhaustive questions" on remand (*id.* at 1023-24)—which the government addresses in this memorandum (*see infra* at Section IV.C). At the same time, the panel majority recognized that "the historical analysis required by *Bruen* will be difficult and no doubt yield some measure of indeterminacy." *Id.* at 1024.

In dissent, Judge Wood explained that she would have upheld § 922(g)(1) as constitutional without requiring a remand. *Id.* at 1018-38. Noting that "[g]un ownership and use in this country (both before and after the adoption of the 1787 Constitution) have always been subject to reasonable regulations," Judge Wood identified a "vast and diverse array of gun laws stretching from the colonial period, through the Founding Era, through Reconstruction (when the Fourteenth Amendment was added to the Constitution and ultimately made the Second Amendment applicable to state regulation), up to the present day." *Id.* at 1030, 1033. Judge Wood continued:

> This is what makes up the text, history, and tradition to which *Bruen* directs us. And text, history, and tradition all point in the same direction: firearms have always

---

[3] The *Atkinson* plaintiff submitted his opening brief on appeal before *Bruen* was decided, and the government submitted its response brief only one month after the decision. Appeal No. 22-1557, Dkt. 11, 21.

been regulated in precisely the ways that concern us in the third decade of the 21st century.

*Id.* at 1033. More specifically, Judge Wood explained that "the record behind the felon disentitlement statutes":

> reveals that, since the founding, governments have been understood to have the power to single out categories of persons who will face total disarmament based on the danger they pose to the political community if armed. That presumptive power is on display in the loyalty oath laws . . . and in the laws that disarmed persons found guilty of treason and members of native tribes. Though some of those laws would no longer pass muster under the Equal Protection Clause, they reveal conclusively the scope of governmental power that was understood to exist at the time the Second Amendment was adopted. This power allowed the creation of categorical restrictions without any case-by-case escape hatch. *Section 922(g)(1) does precisely what statutes have been doing since the mid-18th century. It identifies the group of persons deemed dangerous to the political community—those convicted of the defined felonies—and it makes it unlawful for them to possess a firearm.*

*Id.* at 1035-36 (emphasis added).

## III.   ARGUMENT

Three independent but mutually reinforcing legal principles support *Heller's* approval of felon-disarmament laws. First, felons disqualified from possessing firearms under Section 922(g)(1) are not among "the people" protected by the Second Amendment. Second, the Second Amendment has historically been understood to protect law-abiding individuals, not convicted felons. Third, the Second Amendment has historically been understood to protect only responsible individuals, and felons, as a category, are not responsible.

### A.   The Possession of Firearms by Felons Is Not Protected Under the Plain Text of the Second Amendment.

The Second Amendment secures "the right of the people to keep and bear arms." U.S. Const. Amend. II (emphasis added). "'The people'" is "a term of art employed in select parts of the Constitution" to refer to "a class of persons who are part of a national community." *Heller*, 554

U.S. at 580 (brackets and citation omitted). The Second Amendment thus guarantees the right to bear arms only to "members of the political community," not to all persons. *Ibid*.

The Second Amendment's background illuminates the reasons for that limitation. The Founders codified the right to bear arms in large part because they regarded it as an important "safeguard against tyranny." *Heller*, 554 U.S. at 600. Justice Story, for instance, described the right to bear arms as the "palladium of the liberties of a republic" and explained that it "enable[s] the people to resist and triumph over" the "usurpation and arbitrary power of rulers." 3 Joseph Story, Commentaries on the Constitution of the United States § 1890, at 746 (1833). It makes sense that a right that was codified in order to enable the polity to "resist tyranny," *Heller*, 554 U.S. at 598, would be limited to the members of that polity.

Consistent with that understanding, persons who do not belong to the political community have historically been denied the right to bear arms. For example, the right to bear arms has historically been reserved to "citizens." *Heller*, 554 U.S. at 635; see *id*. at 581 ("Americans"). Noncitizens at the Founding lacked the "right to bear arms"—just as they lacked other "rights of members of the polity," such as the right to "vote, hold public office, or serve on juries." Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (1998). Even today, federal law disarms certain noncitizens— specifically, those who are unlawfully present in the United States, those who are present on nonimmigrant visas, and those who have renounced U.S. citizenship. *See* 18 U.S.C. 922(g)(5) and (7).

Like noncitizens, felons disarmed under Section 922(g)(1) are not among "the people" protected by the Second Amendment because they have forfeited their membership in the political community. *Cf. Voisine v. United States*, 579 U.S. 688, 715 (2016) (Thomas, J., dissenting) (tying *Heller's* approval of felon disarmament to the understanding that certain individuals "are beyond the scope of the 'People' protected by the Second Amendment"). States have long denied felons

the rights of members of the polity—the right to vote, *see* U.S. Const. Amend. XIV, § 2; *Richardson v. Ramirez*, 418 U.S. 24, 41-56 (1974); the right to hold public office, *see Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998); and the right to serve on juries, *see ibid*. And as a leading 19th-century scholar explained, "the felon" has "been almost universally excluded" from "the people in whom is vested the sovereignty of the State." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868).

McCaa reasons that other constitutional provisions use the term "the people" and that the term's meaning cannot vary from provision to provision. ECF 56, at 5-8. But while the phrase "the people" refers to members of the political community throughout the Constitution, *see Heller*, 554 U.S. at 580, the scope of that community varies from provision to provision. For example, noncitizens are not among "the people" protected by the Second Amendment, *see id*. at 581, but certain noncitizens are among "the people" protected by the Fourth Amendment, *see United States v. Verdugo-Urquidez*, 494 U.S. 259, 265, 271-273 (1990). The same is true of felons. And many other constitutional provisions use the term "the people" in a manner that excludes felons who have forfeited the rights that come with membership in the polity. Such felons are not among "the people" who adopted the Constitution, *see* U.S. Const. Pmbl; or "the people" who are entitled to elect members of Congress, *see* U.S. Const. Art. I, § 2, Cl. 1; Amend. XVII, Cls. 1-2; or "the people" who reserved powers not delegated to the government, *see* U.S. Const. Amend. X. So too, felons disarmed under Section 922(g)(1) are not among "the people" entitled to keep and bear arms.

**B.      Section 922(g)(1) Is Consistent With This Nation's Historical Traditions.**

Even if this Court were to conclude that the Second Amendment covers possession of firearms by felons, McCaa still cannot prevail under *Bruen* because § 922(g)(1) "is part of the

13

historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S. Ct. at 2127. That right has historically been understood to extend only to law-abiding persons.

In England before the Founding, felons had no right to keep and bear arms. The standard penalty for a felony was death. *See* 4 William Blackstone, Commentaries on the Laws of England 98 (1769). That punishment extended even to non-violent felonies, such as smuggling, *id.* at 155; fraudulent bankruptcy, *id*. at 156; violating quarantine, *id*. at 162; forging a marriage license, *id*. at 163; and cutting down a cherry tree, *id*. at 4. A felon awaiting execution would be held in prison—where he would have no access to arms. *See id.* at 131 (discussing a statute making it unlawful to provide "any arms" to a "prisoner in custody for treason or felony"). A conviction would also usually result in the escheat of the felon's estate and the forfeiture of all his goods and chattels—including, of course, his arms. *See id.* at 379- 382. A convicted felon, finally, was deemed "already dead in law" even before his execution. *Id.* at 374. That status, known as "civil death," involved "an extinction of civil rights, more or less complete." *Avery v. Everett*, 18 N.E. 148, 150 (N.Y. 1888). A convicted felon thus had no "right to vote, to sit as a juror, to bear arms, [or] to marry"; indeed, "his physical conditions were such that he could do none of these things." *Id.* at 156 (Earl, J., dissenting) (emphasis added).

Early Americans accepted that legislatures had the power to subject felons to similar deprivations. Thus, "death was 'the standard penalty for all serious crimes' at the time of the founding." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019) (citation omitted). As in England, the death penalty extended even to non-violent crimes, such as forgery and horse theft. *See Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir.), *cert. denied*, 140 S. Ct. 645 (2019). Many States also subjected certain felons to the complete forfeiture of their estates or their goods and chattels. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 nn. 275-276 (2014) (collecting statutes). And at least some States enacted statutes carrying forward the

14

common-law doctrine of civil death. *See, e.g., In re Deming*, 10 Johns. 232, 233 (N.Y. 1813) (per curiam).

Those punishments were justified by the belief that a person can lose his legal rights by violating "his part of the [social] contract." 4 Blackstone 375. Capital punishment, for example, was justified on the ground that the right to life can be "forfeited for the breach of th[e] laws of society." 1 Blackstone 129. The confiscation of felons' estates was likewise justified on the ground that "property was a right derived from society which one lost by violating society's laws." *Austin v. United States*, 509 U.S. 602, 612 (1993); *see Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 682 (1974) ("[A] breach of the criminal law * * * was felt to justify denial of the right to own property."). And civil death was justified on the ground that someone who has committed a felony should no longer possess "any rights growing out of organized society." *Avery*, 18 N.E. at 155 (Earl, J., dissenting).

Because the traditional punishment for serious crimes was death, early legislatures had little occasion to enact laws explicitly disarming persons convicted of such crimes. They did, however, enact laws disarming persons who had committed certain offenses that were not punishable by death. For example, an English statute provided that a person could not "keep arms" if he had been "convicted in a court of law of not attending the service of the church of England." 4 Blackstone 55; *see* 3 Jac. 1, c. 5, § 16 (1605) (Eng.). In 1624, Virginia punished a person for "base" and "opprobrious" speech by ordering him "disarmed" and declaring him ineligible to exercise "any priviledge or freedom" in the colony. David Thomas Koning, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354, 371 (1982). And in 1775, Connecticut enacted a statute providing that a person who was convicted of "libel[ing] or defam[ing]" certain colonial resolutions "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June,*

*1776*, at 193 (Charles J. Hoadly ed., 1890). The fact that legislatures disarmed individuals who committed those offenses suggests, *a fortiori*, the constitutionality of disarming those who commit felonies.

Moreover, some Founding Era sources expressly recognized that the right to bear arms extended only to law-abiding individuals. In 1780, for example, the Town of Williamsburg, Massachusetts, adopted a resolution proclaiming: "we esteem it an essential priviledge to keep Arms in Our houses for Our Own Defence and *while we Continue honest and Lawfull Subjects of Government* we Ought Never to be deprived of them." *The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780*, at 624 (Oscar Handlin & Mary Handlin eds., 1966) (emphasis added). And Anti-Federalists at the Pennsylvania ratifying convention proposed a bill of rights that, among other things, forbade "disarming the people or any of them, *unless for crimes committed*, or real danger of public injury from individuals." 2 *The Documentary History of the Ratification of the Constitution* 598 (Merrill Jensen ed., 1976) (emphasis added).

C.    **The Second Amendment Allows Congress to Disarm Irresponsible Individuals**

By the time the Second Amendment was ratified in 1791, there was an established tradition of legislatures exercising broad authority to disqualify people categorically from possessing firearms based on a judgment that certain groups simply could not be trusted to adhere to the rule of law.

a.    **England**

Because the Second Amendment "'codified a right inherited from our English ancestors,'" English legal tradition sheds important light on the limits to the "'right secured by the Second Amendment.'" *Bruen*, 142 S. Ct. at 2127-28 (quoting *Heller*, 554 U.S. at 599, 626). Among the

limits well-established in England was the authority to disarm classes of people who, in the legislature's view, could not be relied upon to obey the rule of law.

In 1689, for example, the English government passed a law disarming Catholics who refused to make declarations renouncing their faith. 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71-73 (1688).[4] This "Act for the better secureing the Government by disarming Papists and reputed Papists" provided that a Catholic could not "have or keepe in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defence of his House or person)." *Id.*; *see also Jackson*, 69 F.4th at 502. Enacted shortly after the Glorious Revolution of 1688—when Protestant King William and Queen Mary succeeded Catholic King James II—this statute reflected the new government's perception that Catholics who refused to renounce their faith (and thus their allegiance to the Pope) could not be trusted to obey English law. *Range*, 69 F.4th at 121-22 (Krause, J., dissenting); *see also Jackson*, 69 F.4th at 502. This prohibition was not based on a theory that all Catholics were dangerous; rather, the categorical disarmament was based on a concern with a group's propensity to disobey the sovereign. *Range*, 69 F.4th at 121-22 (Krause, J., dissenting). *See also Heller*, 554 U.S. at 592-93 ("Between the Restoration and the Glorious Revolution, the Stuart Kings Charles II and James II succeeded in using select militias loyal to them to suppress political dissidents, in part by disarming their opponents.") (Scalia, J.).[5]

In her oft-cited dissent in *Kanter v. Barr*, then-Judge Barrett also observed that the English Parliament disarmed Catholics, although her analysis focused on the "threatened violence and the

---

[4] Though the statutory compilation identifies this as a 1688 act, it was enacted in 1689. *See* 14 *Journals of the House of Lords* 1685-1691, at 208-09 (1767-1830) (reflecting enactment on May 11, 1689); *Bill of Rights* [1688], https://www.legislation.gov.uk/aep/WillandMarSess2/1/2 (explaining that "[i]t appears that all the Acts of" the first Parliament of William and Mary "were treated as being Acts of 1688" in official sources under an "old method of reckoning"—including the English Bill of Rights, discussed shortly, which was similarly enacted in 1689).

[5] The statute also made clear that its concern was with propensity to disobey the sovereign by providing that anyone who decided to make the declaration after having previously refused would regain the ability

risk of public injury" that Catholics (and later on, slaves and Native Americans) were presumed to present as the primary reason for disarmament. 919 F.3d 437, 456–58 (7th Cir. 2019). But even then-Judge Barrett's dissent recognized "that [the English] Parliament disarmed Catholics because the Protestant majority found them 'untrustworthy.'" *Id.* at 457 (citing Adam Winkler, *Gunfight* 115 (2011)). Moreover, a focus on untrustworthiness—rather than, more explicitly, danger—has other historical roots. For instance, "[f]ollowing the tumult of the English Civil War, the restored Stuart monarchs disarmed nonconformist (*i.e.*, non-Anglican) Protestants," even though such nonconformists included pacifist denominations like the Quakers. *Range*, 69 F.4th at 120-21 (Krause, J., dissenting) (collecting sources). Such groups "often refused to take mandatory oaths acknowledging the King's sovereign authority over matters of religion" and, as a result, "Anglicans accused nonconformists of believing their faith exempted them from obedience to the law." *Id.* Their commitment to non-violence did not spare their firearms. *See also Jackson*, 69 F.4th at 504 ("Not all persons disarmed under historical precedents—not all Protestants or Catholics in England, not all Native Americans, not all Catholics in Maryland, not all early Americans who declined to swear an oath of loyalty—were violent or dangerous persons" and yet they were disarmed nonetheless); *Range*, 69 F.4th at 124-26 (Krause, J., dissenting) (noting that colonial- and Revolutionary-war-era laws disarmed "sizable numbers of pacifists" such as the Quakers, Moravians, and Mennonites, "not . . . because they were dangerous, but rather because

---

to keep and bear arms. 1 W. & M., Sess. 1, c. 15, *in* 6 *The Statutes of the Realm*, *supra*, at 72. Other colonial- and founding-era laws discussed later in this response had similar "restoration" provisions. *See also, e.g.*, *Range*, 69 F.4th at 123, 125-26 (Krause, J., dissenting); *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting). Section 922(g)(1) has similar provisions, allowing for the restoration of the right to keep arms upon the requisite showing. 18 U.S.C. §§ 921(a)(20) and 925(c); *see also Atkinson*, 70 F.4th at 1036 (Wood, J., dissenting) (noting that "Congress has never chosen to activate" the § 925(c) mechanism, but that her analysis of § 922(g)(1)'s constitutionality "does not depend on its existence").

their refusal to swear allegiance demonstrated that they would not submit to communal judgments in law when it conflicted with personal conviction").

The aforementioned examples from England are particularly relevant because the same Parliament wrote the 1689 English Bill of Rights, which "enshrined basic civil liberties" and became the predecessor to our Second Amendment. *Bruen*, 142 S. Ct. at 2141; *Heller*, 554 U.S. at 593; *Atkinson*, 70 F.4th at 1031 (Wood, J., dissenting). That predecessor specified that "*Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law*." 1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* 143 (1688) (emphases added); *see also Jackson*, 69 F.4th at 502; *Atkinson*, 70 F.4th at 1031 (Wood, J., dissenting). "Englishmen had never before claimed the right of the individual to arms." *Bruen*, 142 S. Ct. at 2142 (quotation marks and citation omitted). And yet when they first formally claimed that right, the English ensured that the Parliament retained the power—which it in fact exercised—to arm one class of the population and to disarm another based on concerns that the members of that latter class would not abide by the law. *See Atkinson*, 70 F.4th at 1031 ("Not quite a ringing endorsement of an untrammeled right to keep and bear arms, it instead builds in the idea that this right exists 'as allowed by law.'") (Wood, J., dissenting).

### b. Colonial America

The American colonies inherited the English tradition of broad legislative authority to disarm classes of people who were not dependable adherents to the rule of law. For example, firearm regulations directed toward disarming Native Americans and Black people were pervasive.[6] "While some of these categorical prohibitions of course would be impermissible today

---

[6] *See* Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 28-29 (2006); *see also, e.g.*, *Laws and Ordinances of New Netherland, 1638-1674*, at 18-19 (1868) (1639 New Netherland law); 1 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 255-56 (1823) (1643 Va. law); 5 *Records Of The Colony Of New Plymouth* 173 (1856) (1675 Plymouth law); 2 *Records of the Colony of Rhode Island and Providence Plantations* 561 (1857) (1677 R.I. law); 2 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 481-82 (1823) (1680 Va. law); *Grants,*

under other constitutional provisions, they are relevant here in determining the historical understanding of the right to keep and bear arms." *Jackson*, 69 F.4th 503; *see also Range*, 69 F.4th at 122 n.50 (Krause, J., dissenting) (rejecting these "bigoted and unconstitutional laws" but citing them to demonstrate the "tradition of categorical, status-based disarmaments"). The colonies also disarmed full-fledged members of the political community—*i.e.*, free, Christian, white men— "whom the authorities believed could not be trusted to obey the law." *Range*, 69 F.4th at 122 (Krause, J., dissenting). "Those restrictions are telling because they were imposed at a time when, before the advent of the English Bill of Rights, the charters of Virginia and Massachusetts provided unprecedented protections for colonists' firearm rights." *Id.* (citing Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 174 (3d ed. 2022)).

Massachusetts, for example, disarmed the supporters of an outspoken preacher in the 1630s "not because those supporters had demonstrated a propensity for violence," but because "the authorities concluded their conduct evinced a willingness to disobey the law." *Range*, 69 F.4th at 123 (Krause, J., dissenting) (citing Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635, 637-38, 644, 648 (1937)); Ann Fairfax Withington & Jack Schwartz, *The Political Trial of Anne Hutchinson*, 51 New Eng. Q. 226, 226 (1978); James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 New Eng. Q. 381, 391 (1988); John

---

*Concessions, and Original Constitutions of the Province of New Jersey: The Acts Passed During the Proprietary Governments, and Other Material Transactions Before the Surrender Thereof to Queen Anne* 341 (1753) (1694 N.J. law); 2 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 235 (1896) (1706 Pa. law); 1 *The Laws of Maryland, With The Charter, The Bill of Rights, The Constitution of The State, and Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments* 117-18 (1811) (1715 Md. Law); 6 *The Public Records Of The Colony Of Connecticut* 381-82 (1872) (1723 Conn. law); *Laws of New York From The Year 1691 to 1773*, at 199 (1752) (1730 N.Y. Law); *A Complete Revisal of All the Acts of Assembly, of the Province of North-Carolina, Now in Force and Use* 152-54 (1773) (1753 N.C. law); 6 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 319-20 (1899) (1763 Pa. law); *Digest of the Laws of the State of Georgia From Its First Establishment as a British Province Down to the Year 1798, Inclusive, and the Principal Acts of 1799*, at 153-55 (1800) (1768 Ga. Law); *see also Atkinson*, 70 F.4th at 1035 n.2 (Wood, J., dissenting) (citing "laws that disarmed persons found guilty of treason and members of native tribes").

Felipe Acevedo, *Dignity Takings in the Criminal Law of Seventeenth-Century England and the Massachusetts Bay Colony*, 92 Chi.-Kent L. Rev. 743, 761 (2017)).

### c.    Revolutionary War

Throughout the Revolutionary War, American legislatures passed numerous disarmament laws targeting those who failed to demonstrate loyalty to the emerging American government.

An early example is a 1775 Connecticut law providing that any person convicted of "libel[ing] or defam[ing]" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 193 (1890) (1775 Conn. law). In 1776, the Continental Congress recommended that colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort. 4 *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776). At least six of the colonies enacted legislation in this vein. *See* 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479-84 (1886) (1776 Mass. law); 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862) (1776 R.I. law); 1 *The Public Acts of the General Assembly of North Carolina* 231 (1804) (1777 N.C. law); *Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*, at 90 (1777) (1777 N.J. law); 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 112-13 (1903) (1777 Pa. law); 9 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 282 (1821) (1777 Va. law); *see also Jackson*, 69 F.4th at 503 ("In the era of the Revolutionary War, the Continental Congress, Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey prohibited possession of firearms by people who refused to declare an oath of loyalty."); *Atkinson*, 70 F.4th at 1034 (Wood,

J., dissenting) ("During the American Revolution, several states passed laws providing for the confiscation of weapons owned by persons who refused to swear an oath of allegiance to the state or to the United States.").

A common feature of these laws was to require oaths of loyalty to the government and to strip anyone who failed or refused to take the oath of the right to bear arms. *See, e.g.*, 1776 Mass. law at 479-80; 1776 R.I. law at 566-67; 1777 N.C. law at 229-31; 1777 Pa. law; at 111-13; 1777 Va. law at 281-82. Many of these laws provided that failing or refusing to take the oath resulted in forfeiture of a bundle of additional political rights, including the rights to vote, to serve on juries, and to hold public office—further reinforcing the longstanding connection between arms-bearing and these related rights, *see supra* at Section IV.A. *See, e.g.*, 1776 Mass. law at 481; 1777 N.C. law at 231; 1777 Pa. law at 112-13; 1777 Va. law at 282.

As noted earlier, the Pennsylvania law had the effect of depriving "sizable numbers of pacifists" of the right to bear arms "because oath-taking violated the religious convictions of Quakers, Mennonites, Moravians, and other groups." *Range*, 69 F.4th at 125 (Krause, J., dissenting). That law is also particularly informative because the year before enacting it, Pennsylvania became one of the first states to adopt a state constitutional provision protecting an individual right to bear arms. *Heller*, 554 U.S. at 601; *see* Pa. Declaration of Rights of 1776 § XIII, *in The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins* 278 (Neil Cogan ed., Oxford University Press 2d ed., 2014); *see also* N.C. Declaration of Rights of 1776 § XVII, *in The Complete Bill of Rights, supra*, at 277-78 (individual rights-based constitutional provision adopted the year before the North Carolina disarmament law cited above); Mass. Const. of 1780, pt. I, art.

XVII, *in The Complete Bill of Rights*, *supra*, at 277 (individual rights-based constitutional provision adopted four years after the Massachusetts disarmament law cited above).

### d.    Ratification Debates

The history behind the Second Amendment's adoption provides additional persuasive evidence that the founders understood the individual right to bear arms to be compatible with broad legislative authority to disarm groups who could not be trusted to follow the law.

One "Second Amendment precursor" that *Heller* described as "highly influential" is particularly instructive. 554 U.S. at 604. When the Pennsylvania ratifying convention met in 1787, one of the "main issues throughout the . . . debate" was the Antifederalists' objection to the Constitution's "lack of a Bill of Rights." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627 (1971). Although the Antifederalists did not persuade a majority of the convention to reject ratification on this basis, their principal objections were ultimately vindicated four years later through the adoption of the Bill of Rights, eight provisions of which—including the Second Amendment—echoed a set of amendments first proposed by the Pennsylvania Antifederalists. *Id.* at 628 (explaining that these specific proposals are "of great importance in the history of the federal Bill of Rights"). The Pennsylvania Antifederalists' proposed constitutional amendment regarding the right to bear arms stated: "no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals." *Id.* at 665 (emphasis added). In other words, the founders recognized that "crimes committed"—violent or not—can supply an independent ground for a legislature to prohibit firearm possession. As the D.C. Circuit has explained, "[t]he use of the word 'or'" in this proposal reflects that "criminals, in addition to

those who posed a 'real danger,'" have historically been "proper subjects of disarmament." *Medina*, 913 F.3d at 158-59.

The Pennsylvania Antifederalists were not alone in proposing a Second Amendment precursor that expressly permitted laws disarming untrustworthy people. At the Massachusetts convention, founding father Samuel Adams proposed an amendment providing that the "Constitution be never construed to authorize Congress . . . to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 2 Schwartz, *supra*, at 675, 681 (emphasis added) (quotation marks omitted). And in New Hampshire, the convention recommended an amendment providing that "Congress shall never disarm any Citizen unless such as are or have been in *Actual Rebellion*." *Id.* at 758, 761 (emphasis added). These proposals, like the Pennsylvania one, recognize the prevailing historical tradition of broad legislative power to disarm people who fell outside the trustworthy, law-abiding citizenry.

To be sure, the Second Amendment, as adopted, does not include the same language as these proposals. But it would have been "obvious" to the founders that certain groups, including "the felon," Cooley, *supra*, at Section IV.A, could properly be subject to disarmament laws consistent with the "*pre-existing* right" that was "codified" in the Second Amendment, *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 592). *See also* Amar, *supra*, at 48; Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) (founding-era proponents of a constitutional right to bear arms "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment," because this limitation "was understood").

Under *Bruen*, the absence of any meaningful founding-era "disputes regarding the lawfulness" of potential regulations disarming criminals or dangerous people permits courts to "assume it settled" that such regulations are "consistent with the Second Amendment." 142 S. Ct.

at 2133. Indeed, Section 922(g)(1) is consistent with the historical tradition of imposing categorical limits on the right to keep and bear arms. Common sense suggests that "felons are more likely to commit violent crimes" than are lawabiding individuals. *United States v. Barton*, 633 F.3d 168, 175 (3d Cir. 2011). "[N]umerous studies" show a "link between past criminal conduct and future crime, including gun violence." *Binderup v. Attorney General United States*, 836 F.3d 336, 400 (3d Cir. 2016) (Fuentes, J., concurring in part, dissenting in part, and dissenting from the judgments), *cert. denied*, 582 U.S. 943 (2017); *see id.* at 400 n.160 (collecting studies). And the Supreme Court has repeatedly recognized that persons who have been "convicted of serious crimes," as a class, can "be expected to misuse" firearms. *Dickerson v. New Banner Institute, Inc*., 460 U.S. 103, 119 (1983); *see, e.g., Lewis v. United States*, 445 U.S. 55, 67 (1980) ("The federal gun laws * * * [focus on the] fact of conviction * * * in order to keep firearms away from potentially dangerous persons."); *Barrett v. United States*, 423 U.S. 212, 220 (1976) ("The history of [Section 922(g)] reflects a similar concern with keeping firearms out of the hands of categories of potentially irresponsible persons, including convicted felons.").

### D.  Summary

To help summarize the analysis set forth above, the government relies on the questions expressly posed by the *Atkinson* panel majority. 70 F.4th at 1023-24. In response to those questions, the government states:

*First*, § 922(g)(1) addresses a "general societal problem that has persisted since the 18th century" in that the statute relates to the disarmament of individuals who, like felons, are untrustworthy adherents to the rule of law. The historical record discussed above demonstrates that the founders inherited a tradition under which legislatures had broad discretion to disarm classes of people that could not be counted upon to be responsible, law-abiding members of the polity.

Like the laws enacted by earlier generations, § 922(g)(1) permits legislatures to categorically disarm groups of people who present that concern.

*Second*, history tells us that (1) across relevant eras, legislatures categorically disarmed groups who they feared would disregard the law and disturb the social order and that such a categorical prohibition specifically appeared in the English precursor to the Second Amendment; (2) the Ratification Debates reflect no meaningful founding-era disputes regarding the lawfulness of disarming criminals, despite the use of express language to that effect in influential American precursors to the Second Amendment, thus demonstrating that the founders understood the right to bear arms to be compatible with the broad legislative authority to disarm felons; and (3) under English common law and throughout early American history, convicted felons were subject to capital punishment, estate forfeiture, and so-called "civil death," thus demonstrating that firearms dispossession was subsumed within those greater punishments and the expulsion of felons from the political community.

From these lessons, this Court can conclude that § 922(g)(1) does not violate the Second Amendment. The aforementioned regulations were pervasive, and their underlying rationales—like the impetus behind § 922(g)(1)—prioritized social order and respect for the law over a pre-existing right to self-defense. *See Bruen*, 142 S. Ct. at 2132-33 (directing courts to consider as "*central* considerations when engaging in an analogical inquiry," "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified"); *Jackson*, 69 F.4th at 504-05 (explaining that § 922(g)(1) aims to disarm individuals viewed as "potentially irresponsible" and to prevent not just violence, but also "lawlessness"). Although some of these predecessors do not apply specifically to felons, this Court should remain mindful of *Bruen*'s admonition that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*"

and "[s]o even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." 142 S. Ct. at 2133. Moreover, the lack of an identical historical statute does not suggest that the founding generation would have viewed § 922(g)(1) as violating the Second Amendment. As one district court has observed, a "list of the laws that *happened to exist* in the founding era is . . . not the same thing as an exhaustive account of what laws would have been theoretically *believed to be permissible* by an individual sharing the original public understanding of the Constitution." *United States v. Kelly*, No. 3:22-CR-37, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022). Founding-era legislatures cannot be presumed to have legislated to the full limits of their constitutional authority.

*Third*, although the government has emphasized the historical rationale for disarming groups perceived as an overall threat to the social order, a historical rationale for disarmament based on perceived danger supplies another helpful analogue. In *Jackson*, the Eighth Circuit reviewed a substantially similar set of historical materials as the materials summarized above and concluded that they could be read as supporting either rationale. 69 F.4th at 502 ("While the better interpretation of the history may be debatable, we conclude that either reading supports the constitutionality of § 922(g)(1) as applied to Jackson and other convicted felons."). *See also id.* at 502-05 (evaluating historical materials through a dangerousness lens).

A dangerousness-rooted historical rationale for disarmament supports the validity of § 922(g)(1), as applied to all felons. As *Jackson* explained, "[l]egislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable *risk of danger* if armed," not based on "an individualized determination of dangerousness as to each person in a class of prohibited persons." *Id.* at 504 (emphasis added). *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) (historical evidence supports the proposition "that the legislature may disarm those who have demonstrated *a proclivity for violence or whose*

*possession of guns would otherwise threaten the public safety"*) (emphasis added). And as the Seventh Circuit's *Kanter* majority has explained, "prohibiting even nonviolent felons . . . from possessing firearms is substantially related to [the government's] interest in preventing gun violence" where an empirical connection exists "between nonviolent offenders . . . and a risk of future violent crime." 919 F.3d at 448-49. The Seventh Circuit said the same in *Yancey*, explaining that "most felons are nonviolent, but someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use." 621 F.3d at 685. *See also Kaemmerling v. Lappin*, 553 F.3d 669, 683 (D.C. Cir. 2008) ("[N]onviolent offenders not only have a higher recidivism rate than the general population, but certain groups—such as property offenders—have an even higher recidivism rate than violent offenders, and a large percentage of the crimes nonviolent recidivists later commit are violent.").

*Fourth*, the aforementioned analogous laws supply enough of a historical tradition to support the constitutionality of § 922(g)(1). These are not "isolated instances of regulation," *Atkinson*, 70 F.4th at 1024, but are rather rooted in English common law and were adopted across the colonies before their understanding and the practice they represented was incorporated into the Second Amendment.

The government addresses the fifth and final question posed by *Atkinson* in the section that follows regarding the as-applied nature of defendant's challenge.

### E.  Construed as an As-Applied Challenge, McCaa's Motion Still Fails.

To the extent McCaa is making an "as applied" challenge to the constitutionality of § 922(g)(1), that challenge should be rejected.

The Seventh Circuit has never actually upheld an "as applied" Second Amendment challenge to § 922(g) and has, in fact, "repeatedly rejected as-applied Second Amendment challenges" to that statute. *See Kanter,* 919 F.3d at 443. Certainly, the Seventh Circuit in *Kanter*

noted that it "left room for as-applied challenges" to § 922(g). 919 F.3d at 443. But, to date, the Seventh Circuit has not done so.

Regardless, there is no question here that McCaa is a convicted felon, that is, a non-law-abiding citizen not covered by the Second Amendment and subject to firearms regulations consistent with this nation's historical tradition. McCaa suggests that he is exempt from this ban because he, personally, was not previously convicted of an offense involving the use of force, the attempted use of force, or threatened use of force against the person or property of another. ECF 56 at 2. McCaa's attempt to exempt himself from the scope of § 922(g)(1) by re-purposing language from the categorical approach—used by courts to make narrow determinations as to whether, for example, a particular predicate offense qualifies as a "crime of violence" for purposes of a particular statute—fails for at least three reasons.

First, McCaa has proffered no historical evidence to support a position that the constitutionality of § 922(g)(1) turns on individualized assessments. This is a flaw that the *Atkinson* panel majority also noted:

> [A]lthough Atkinson has shown some support for the idea that a group's "dangerousness" is what mattered to the Founders, he does not provide much historical basis for individualized assessments or for delineating between individuals who committed violent versus non-violent crimes. The distinction is not an obvious consequence of many of the laws that Atkinson, and his amicus especially, discuss.

70 F.4th at 1023; *see also id.* ("Atkinson's historical analysis falls short."). Instead, as detailed above, the historical tradition supports the legislature's ability to disarm *categories* of individuals. *See Atkinson*, 70 F.4th at 1035 (Wood, J., dissenting) ("since the founding, governments have been understood to have the power to single out categories of persons who will face total disarmament"); *Jackson*, 69 F.4th at 504 ("Legislatures historically prohibited possession by categories of persons . . . ."); *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting) (disarmament "is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons"); *United*

*States v. Booker*, 644 F.3d 12, 23 (1st Cir. 2011) (pre-*Bruen*, explaining that "the Second Amendment permits categorical regulation of gun possession by classes of persons . . . rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis"). The relevant question, in other words, is whether the status at issue indicates that the person cannot be trusted to use a gun responsibly, not whether each individual can be trusted to do so.[7]

Second, McCaa has proffered no historical evidence to support a position that, even assuming the historical tradition supports disarming only "dangerous" individuals, the definition of "dangerous" is limited to the use, attempted use, or threatened use of force. *See Atkinson*, 70 F.4th at 1024 ("Nor does Atkinson tell us what the Founders would have viewed as a 'violent' crime and what evidence they would consider in making that determination."). In fact, as set forth above, the historical tradition reflects a far broader conception of "dangerous," one that includes even the risk of violence. *See, e.g.*, *Atkinson*, 70 F.4th at 1035 (Wood, J., dissenting) (disarmament was "based on the danger [categories of persons] pose[d] to the political community if armed"); *Jackson*, 69 F.4th at 504 (disarmament "based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed"); *Alaniz*, 69 F.4th at 1129-30 (there is "a longstanding tradition of enhancing a defendant's sentence for the increased risk of violence created by mere possession of a firearm during the commission of certain crimes"); *Kanter*, 919

---

[7] Individualized assessments could also yield wildly disparate results. *See, e.g.*, *Atkinson*, 70 F.4th at 1027 (Wood, J., dissenting) (suggesting that enabling individuals to seek to establish a case-specific exemption from a generally applicable criminal law would create "an arbitrary patchwork of decisions—as far from the rule of law as one could image"); *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011) (individualized exemptions would "obviously present serious problems of administration, consistency and fair warning"). And in the criminal context, in particular, the opportunity for pre-trial fact-finding is limited by Federal Rule of Criminal Procedure 12, which makes such as-applied challenges difficult to administer and resolve before trial if individualized facts, at least those relevant to the crime itself (like a § 922(g)(3) offense), are relevant. *See, e.g.*, *United States v. Pope*, 613 F.3d 1255 (10th Cir. 2010) (Gorsuch, J.) (concluding that as-applied Second Amendment challenge to § 922(g)(9) could not be brought pre-trial because the defendant "contends the statute is unconstitutional only in light of the 'facts surrounding the commission of the alleged offense'—the very facts a court may not consider before trial" (citation omitted)); Fed. R. Crim. P. 12(b)(3) (limiting pretrial motions to motions that "can be determined without a trial on the merits").

F.3d at 456 (Barrett, J., dissenting) ("Breaches of the peace comprise not only cases of actual violence to the person of another, but any unlawful acts, tending to produce an actual breach of the peace; whether the peace of the public, or an individual, be in fact disturbed or not.") (citing *Pearce v. Atwood*, 13 Mass. 324, 332 (1816)).

Third, a regime of individualized as-applied challenges to Section 922(g)(1) would distort the separation of powers. In our constitutional system, the Legislative Branch traditionally determines the consequences of criminal convictions—not only the punishment, but also the collateral consequences, such as disfranchisement, disqualification from jury duty, ineligibility for public benefits, sex-offender registration, and disarmament. The Executive Branch, in turn, traditionally grants clemency if it determines that the punishment or the collateral consequences prescribed by law do not fit a particular offender's circumstances. If federal courts were to create a system of as-applied exemptions from Section 922(g)(1), they would in effect usurp the Executive Branch's role of deciding when to make "exceptions" to the "rigor" and "severity" of the "criminal code" enacted by Congress. *The Federalist* No. 74, at 501 (Alexander Hamilton) (Jacob E. Cooke ed. 1961).

A regime of individualized as-applied challenges would also treat the right to possess arms differently from other rights that criminals forfeit upon conviction. As discussed above, States have long denied convicts the right to vote, the right to serve on juries, and the right to hold public office. The Supreme Court has never suggested that a felon can challenge those disabilities on the ground that they do not fit his felony or his circumstances. This court should not treat the right to possess arms any differently.

As detailed at the outset of this response, McCaa has a criminal history that includes felony convictions for drug possession and fleeing/eluding offenses. His record supports a finding of dangerousness (even assuming that label is relevant to the § 922(g)(1) constitutionality analysis)

as it reflects the risk McCaa poses to public safety, his disregard for the law, and society's inability to trust that he will use a weapon responsibly. *See United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011) (characterizing drug crimes as being "associated with dangerous and violent behavior" and thus "warrant[ing] a higher degree of precaution"); *see also Edward Price*, No. 21 CR 164, Dkt. 122 at 5, n.2 (in rejecting constitutional challenge to § 922(g)(1), relying on *Bullock* to explain why a defendant's prior narcotics-related convictions "are indicative of dangerous activity").

There is no question therefore that McCaa is among the class of individuals constitutionally prohibited from possessing firearms under § 922(g)(1) and, therefore, any as-applied challenge fails.

### MOTION FOR EARLY DISCLOSURE OF OTHER ACTS EVIDENCE, EXPERT NOTICE, AND OTHER EVIDENCE (ECF 57)

McCaa also filed a motion for early disclosure of the government's trial evidence, expert notice, and *Giglio* material for government witnesses. ECF 57. More specifically, McCaa seeks an order that the government disclose to defense, at least 60 days prior to trial, the following trial evidence: "(1) other acts evidence under Rule 404(b); (2) notice of expert testimony as required by Fed. R. Crim. P. 16; (3) identification of specific jail calls or other statements of Mr. McCaa the government intends to present at trial; and (4) identification of any specific evidence obtained from any cell phone or cell phone record, social media, or cell site location records that the government intends to present at trial." ECF 57, at 1. In addition, McCaa seeks an order requiring the government to disclose any *Giglio* material pertaining to government trial witnesses at least 45 days prior to trial. *Id.* Citing to no legal authority, McCaa merely asserts that early disclosure will "allow him a reasonable opportunity to respond to the government's evidence, to resolve issues concerning the admissibility of evidence pretrial, and to adequately prepare for trial." *Id.*

As an initial matter, in this case, the government is following the Expanded Discovery

Policy as defined in Criminal L. R. 16(a)(2). This policy is significantly broader than Fed. R. Crim. P. 16. To date, the downloads of cell phones, electronic surveillance records, jail calls, DNA lab reports, latent print reports, and statements that the government intends to introduce at trial have been disclosed to defense. The initial and largest disclosure of discovery was produced on February 7, 2023, on a 4-terabyte hard drive, and it included most of the evidence that the defendant seeks the government to identify well in advance of trial. Smaller disclosures of supplemental discovery were produced on February 28, 2023; March 24, 2023; April 6, 2023; May 17, 2023; June 8, 2023; and September 6, 2023, as additional evidence was collected in this case, including latent print and DNA evidence. In addition, on March 21, 2023, undersigned counsel met with McCaa's counsel to discuss discovery and highlighted key pieces of evidence in the case, including the video footage and a summary of the phone and electronic surveillance records most relevant to the case. Further, the government has also provided to defense counsel several maps prepared by the CAST (Cellular Analysis Survey Team) expert, which document some of the electronic surveillance evidence in the case. Moreover, affidavits supporting numerous search warrants and the criminal complaint (ECF 1) outline the evidence supporting the charges in this case, including summarizing the electronic surveillance and phone evidence that McCaa now wants the government to identify at least 60 days before trial.

McCaa is essentially moving for disclosure on a timeline other than that provided by the local rules and the Federal Rules of Criminal Procedure. McCaa fails to provide any particularized explanation as to why the standard rules are not sufficient in this case. Although the charges in this case are very serious, the issues are not complex. Moreover, the discovery, while voluminous, was produced in large part to McCaa in February 2023, and the government has made itself available for any questions related to discovery. Indeed, cases involving wire fraud, bank fraud, and other violations often involve a significantly larger volume of discovery and more complex

legal issues, and those cases are routinely governed by the standard rules. Because nothing distinguishes this case from those matters and because McCaa has not cited to any authority in support of the instant motion, McCaa's request for early disclosure of the government's trial evidence, including phone, electronic surveillance, defendant's statements, and other acts evidence, should be denied.

With respect to early disclosure of expert notice and *Giglio* material for government witnesses, the government is willing to work with defense counsel to fashion an agreed upon timeline. However, at this point, without a set trial date, scheduling a timeline for these disclosures appears to be premature and is more akin to trial management to be addressed by the District Court. *See United States v. Charmoli*, 20-CR-242, Dkt. 40, at 7 (E.D. Wis. Oct. 21, 2021)(determining that when a "motion affects the trial judge's management of the trial, it is better suited for the Final Pretrial Conference."), *see also* Tips for Parties Practicing before Judge Pepper, Section VI.A., available                                                                                              at https://www.wied.uscourts.gov/sites/wied/files/documents/Tips%20for%20Parties%20Practicing %20Before%20Judge%20Pepper%20%28revised%20November%208%2C%202022%29.pdf (last visited 11/15/2023) (provides Chief Judge Pepper's trial scheduling order, including the filing of witness and exhibit lists, expert notice, and motions *in limine*).

There is no legal authority – under the Constitution, the Rules of Criminal Procedure, or the Local Rules – to require the government to identify all of its evidence, including other acts evidence, or provide expert notice 60 days in advance of trial. McCaa has not supplied this court, at this juncture, with a justifiable reasonable to deviate from the District Court's practices, the local rules, or the Criminal Rules of Procedure. Therefore, his motion for early disclosure of trial evidence and *Giglio* material should be denied.

## CONCLUSION

For the reasons stated above, the Court should deny both of McCaa's pretrial motions.

Dated at Milwaukee, Wisconsin, this 17th day of November, 2023.

Respectfully submitted,

GREGORY J. HAANSTAD
United States Attorney

By:

*s/ Margaret B. Honrath*
MARGARET B. HONRATH
Illinois Bar #6296758
Office of the United States Attorney
Eastern District of Wisconsin
517 E. Wisconsin Ave. Ste. 530
Milwaukee, WI 53202
Telephone: (414) 297-1582
Margaret.Honrath@usdoj.gov