UNITED STATES OF AMERICA,

          Plaintiff,

                                  Case No. 23-cr-8-pp

   v.

KEVIN MCCAA,

          Defendant.

---

**ORDER OVERRULING DEFENDANT'S OBJECTIONS (DKT. NO. 69), ADOPTING JUDGE DRIES'S REPORT AND RECOMMENDATION (DKT. NO. 68) AND DENYING DEFENDANT'S MOTION TO DISMISS COUNT FOUR (DKT. NO. 56)**

---

"In December 2022, a United States postal carrier was shot and killed while delivering mail in Milwaukee." Dkt No. 68 at 1. Investigating the homicide, "law enforcement searched two residences linked to [defendant] Kevin McCaa and found multiple rounds of ammunition." Id. Under federal law—specifically, 18 U.S.C. §922(g)(1)—a person who has been convicted of a crime punishable by a year or more in prison is prohibited from possessing ammunition. A federal grand jury charged the defendant with, among other offenses, unlawful possession of ammunition in violation of 18 U.S.C. §922(g)(1). Dkt. No. 23.

The defendant has moved to dismiss the prohibited person in possession charge (Count Four), arguing that under the framework established by the U.S. Supreme Court's decision in New York State Rifle & Pistol Ass'n v. Bruen, 142

S. Ct. 2111 (2022), §922(g)(1) is unconstitutional both facially and as applied to him. Dkt. No. 56. Magistrate Judge Stephen C. Dries has recommended that this court deny the motion because, "[a]lthough the Second Amendment presumptively protects the defendant's conduct, the government has met its burden of demonstrating that §922(g)(1) is consistent with the United States' historical tradition of firearm regulation." Dkt. No. 68 at 1. The defendant objects to Judge Dries's conclusion that §922(g)(1) is consistent with the nation's historical tradition of firearm regulation. Dkt. No. 69. The court has reviewed *de novo* the portions of Judge Dries's report and recommendation to which the defendant has objected; it will overrule the defendant's objections, adopt Judge Dries's recommendation, and deny the defendant's motion to dismiss Count Four

## I.    Legal Standard

Federal Rule of Criminal Procedure 59(b) governs a district court's referral to magistrate judges of motions to dismiss in criminal cases. Parties have fourteen days to file "specific objections" to a magistrate judge's report and recommendation on a motion to dismiss. Fed. R. Crim. P. 59(b)(2). The district judge must review *de novo* the portions of the magistrate judge's recommendations to which a party timely objects. 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(b)(2), (3). The court may "accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. §636(b)(1). If the defendant does not make a specific objection to the magistrate judge's proposed findings and recommendations, the defendant waives the

right to review. Fed. R. Crim. P. 59(b)(2). That said, even absent an objection, a district judge "retains full authority to decide whether to . . . review the magistrate's report," and 28 U.S.C. §636 "does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard." Thomas v. Arn, 474 U.S. 140, 154 (1985). See also, Mathews v. Weber, 423 U.S. 261, 271 (1976) (a district judge is free to "follow . . . or wholly to ignore" a magistrate judge's recommendation, or if the district judge is not satisfied, "he may conduct the review in whole or in part anew").

## II. Background

### A. Briefing Before Judge Dries

#### 1. *Defendant's Motion (Dkt. No. 56)*

The defendant argued that "§922(g)(1) is unconstitutional both facially and as applied to [him] and the Court should dismiss Count Four with prejudice." Dkt. No. 56 at 1. The defendant began by explaining his criminal history prior to December 27, 2022 (the date officers executed the search warrants at his residences). Id. at 1-2. The defendant asserted that before that date, he had five prior felony convictions. Id. at 2. He recounted that four of his five prior convictions were for simple possession of marijuana as a second or subsequent offense, in violation of Wis. Stat. §961.41(3g)(e). Id. The defendant stated that these convictions occurred in 2005, 2009, 2010 and 2012. Id. He recounted that his fifth prior conviction occurred in 2019, for fleeing an officer after having received a visual or audible signal in violation of Wis. Stat. §346.04(3). Id. The defendant asserted that "[n]one of the statutes [he] was

3

convicted of violating includes an element of force, attempted use of force, or threatened use of force against the person or property of another." Id.

The defendant contended that the Supreme Court's decision in Bruen altered the legal framework surrounding Second Amendment challenges. Id. at 2 (citing Bruen, 142 S. Ct. at 2127). The defendant explained that the Bruen Court had articulated the following framework:

> [T]he standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

Id. at 3 (quoting Bruen, 142 S. Ct. at 2129-30). The defendant observed that the Seventh Circuit has acknowledged that Bruen abrogated its previous precedents and that the Third Circuit has "applied [the Bruen] framework in holding 18 U.S.C. § 922(g)(1) unconstitutional in an as-applied challenge." Id. at 3-4 (citing Atkinson v. Garland, 70 F.4th 1018, 1020 (7th Cir. 2023); Range v. Att'y Gen. United States of Am., 69 F.4th 96 (3d Cir. 2023) (en banc)). The defendant asserted that under the Bruen framework, his alleged conduct— possession of ammunition—is covered by the plain text of the Second Amendment, so the government must "*affirmatively prove* that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." Id. at 4 (quoting Bruen, 142 S. Ct. at 2127) (emphasis in original).

4

Starting with the plain text of the Second Amendment, the defendant claimed that the phrase "the people," as used in the Second Amendment, does not exclude persons with felony convictions.[1] Id. at 5-9. He recounted that in District of Columbia v. Heller, the Supreme Court held that—like the rights enshrined in other Amendments, which refer to "the people"—the rights enshrined in the Second Amendment are "exercised individually *and belong[] to all Americans.*" Id. at 5 (quoting District of Columbia v. Heller, 554 U.S. 570, 581 (2009)) (emphasis in original). The defendant argued that "while the Heller decision also included dicta emphasizing the Second Amendment's protections for 'law-abiding, responsible citizens,' [] the Seventh Circuit has rejected the notion that this dicta limits the scope of the Second Amendment." Id. He explained that in a decision following Heller but preceding Bruen, the Seventh Circuit had stated:

> While some of Heller's language does link Second Amendment rights with the notions of "law-abiding citizens" and "members of the political community," see Heller, 554 U.S. at 580, 625, . . . those passages did not reflect an attempt to define the term "people." We are reluctant to place more weight on these passing references than the Court itself did.

Id. at 5-6 (quoting United States v. Meza-Rodriguez, 798 F.3d 664, 669 (7th Cir. 2015)). The defendant quoted the Seventh Circuit's conclusion that "the term 'the people' in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights[.]'" Id. at 6 (quoting Meza-Rodriguez, 798

---

[1] The parties do not dispute that the Second Amendment includes the right to possess ammunition and the Seventh Circuit "has recognized that corollaries to firearms[, like ammunition,] fall within Second Amendment protection." See Bevis v. City of Naperville, 85 F.4th 1175, 1209 (7th Cir. 2023).

F.3d at 670). The defendant argued that "[n]othing in the Supreme Court's recent Bruen decision casts doubt on [this] understanding" of "the people" as used in Second Amendment. Id. He elaborated that in a post-Bruen decision, the Third Circuit had concluded that the Supreme Court's "law-abiding" language was dicta and had held that "the people" as used in the Second Amendment includes those who have committed felonies. Id. at 6-9 (citing Range, 69 F.4th at 101-03).

The defendant contended that "[b]ecause the plain text of the Second Amendment covers the conduct criminalized by Section 922(g)(1), the burden shifts to the government to 'justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'" Id. at 9-10 (quoting Bruen, 142 S. Ct. at 2130). He argued that "[t]he government cannot meet that burden because the historical record demonstrates that there is no longstanding tradition of preventing non-violent felons from possessing guns." Id. at 10. He emphasized that in Atkinson, the Seventh Circuit had remanded to the district court a Second Amendment challenge to §922(g)(1) for further briefing after opining that the record was "nothing close to what would satisfy the demanding standard set forth in Bruen." Id. (quoting Atkinson, 70 F.4th at 1022). The defendant observed that the Seventh Circuit had decided to remand despite the fact that "the government had provided the court with 'some Founding era commentary,' and explained that '[ ]felons … were historically subject to execution and estate forfeiture, as well as the loss of other civic rights.'" Id. (quoting Atkinson, 70 F.4th at 1022). The defendant

6

asserted that, "[g]iven the *Atkinson* court's statement this type of information 'falls well short of *Bruen's* demands,' the burden is on the government to make a more substantial showing before this court." Id. (quoting Atkinson, 70 F.4th at 1022).

The defendant claimed that "the government will be unable to meet [its] burden" because, "in the early American republic, there were no laws that prohibited non-violent ex-felons from possessing firearms after they had completed their punishment." Id. at 10-11 (citing Conrad Kahn, *Challenging the Federal Prohibition on Gun Possession by Nonviolent Felons*, 55 S. TEX. L. REV. 113, 127 (2013)). The defendant contended that, "[u]nder *Bruen*, that lack of regulation is itself entitled to substantial weight." Id. at 11. He recounted that the Bruen Court had held that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." Id. (quoting Bruen, 142 S. Ct. at 2131). The defendant argued that "[c]rime and recidivism are general societal problems that have existed throughout history" but that "American society did not traditionally respond to these problems by barring all non-violent felons from possessing guns." Id.

The defendant encouraged the court to follow the Third Circuit's Range decision in rejecting any historical evidence the government might present that is not from the founding period or not appropriately analogous to the disputed restrictions. Id. at 11-12 (citing Range, 69 F.4th at 104-05). The defendant

7

observed that the Range court had rejected the government's reliance on a 1961 law restricting firearms, stating that it was "confident that a law passed in 1961—some 170 years after the Second Amendment's ratification and nearly a century after the Fourteenth Amendment's ratification—falls well short of 'longstanding' for purposes of demarcating the scope of a constitutional right." Id. at 12 (quoting Range, 69 F.4th at 104). The defendant recounted that the Range court also had rejected "other older historical analogues proffered by the government that prohibited firearm ownership based on race and religion." Id. (citing Range, 69 F.4th at 105). He asserted that the Range court had rejected these historical analogues after opining that "first, that those restrictions would be unconstitutional today, and second, that the government is required to analogize those prohibited groups to the individual at issue (in that case, Mr. Range)." Id. (citing Range, 69 F.4th at 105). The defendant concluded by urging the court to follow the same analytic framework as the Range court, and in doing so, to hold that §922(g)(1) is unconstitutional both facially and as applied to the defendant. Id.

2.    *Government's Response (Dkt. No. 61)*

The government responded that the defendant's "constitutional claim is without merit, whether construed as a facial challenge or as applied to him." Dkt. No. 61 at 2. The government began by observing that the Supreme Court's recent series of Second Amendment decisions includes language that either explicitly or implicitly supports barring felons from possessing firearms. Id. at 3-7. The government emphasized that the Heller Court had "cautioned that

8

'nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill,' and it described those restrictions as 'presumptively lawful regulatory measures.'" Id. at 4 (quoting Heller, 554 U.S. at 626, 627 n.26). It asserted that the Supreme Court had reaffirmed this understanding the year after Heller, when the plurality in McDonald v. City of Chicago observed that the Supreme Court had "made it clear in Heller that [its] holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill.'" Id. at 5 (quoting McDonald v. City of Chicago, 561 U.S. 742, 786 (2010)). The government contended that although the Bruen Court did not provide the same type of explicit disclaimer as Heller and McDonald regarding restriction of felons' access to firearms, "[t]he Bruen Court repeatedly used the term 'law-abiding citizen' to describe the class of persons protected by the Second Amendment." Id. (citing Bruen, 142 S. Ct. at 2122-56 (listing at least twelve examples of the Bruen Court using phrases like "law abiding citizen")). Id. at 5. The government observed that in his concurrence in Bruen, Justice Kavanaugh had "repeated Heller's statement that 'prohibitions on the possession of firearms by felons' are 'presumptively lawful regulatory measures.'" Id. at 5-6 (quoting Bruen, 142 S. Ct. at 2162 (Kavanaugh, J., concurring)).

The government asserted that "Bruen articulated a revised analytical framework for determining whether a modern firearm regulation is constitutional, directing courts to assess whether such regulations 'are

9

consistent with the Second Amendment's text and historical understanding.'"
Id. at 6 (quoting Bruen, 142 S. Ct. at 2131). The government opined that the
Bruen Court believed that its framework's second step "would be relatively easy
in some instances, when historical analogues are easy to find." Id. (quoting
Bevis, 85 F.4th at 1192). It emphasized, however, that the Bruen Court had
recognized that "[t]he regulatory challenges posed by firearms today" may differ
from the challenges of the past. Id. (quoting Bruen, 142 S. Ct. at 2132). The
government asserted that in those circumstances involving "unprecedented
societal concerns or dramatic technological changes," the Bruen Court had
explained that "a more nuanced approach" is required. Id. (quoting Bruen, 142
S. Ct. at 2132). The government recounted that Bruen directed courts to
consider "historical analogies" to the challenged law, with a focus on "whether
modern and historical regulations impose a comparable burden on the right of
armed self-defense and whether that burden is comparably justified." Id. at 6-7
(quoting Bruen, 142 S. Ct. at 2132-33). The government emphasized the Bruen
Court's assertion that "analogical reasoning requires only that the government
identify a well-established and representative historical analogue, not a
historical twin," "[s]o even if a modern-day regulation is not a dead ringer for
historical precursors, it still may be analogous enough to pass constitutional
muster." Id. at 7 (quoting Bruen, 142 S. Ct. at 2133).

The government argued that "[s]ince _Bruen_, nearly every federal district
and circuit court to have addressed the constitutionality of §922(g)(1)—in
approximately 400 separate rulings—has concluded that the statute remains

10

constitutional" and that "[i]n this district, Judges Griesbach and Adelman have reached the same conclusion." Id. at 7-8. As an example, the government pointed to the Eighth Circuit's decision in United States v. Jackson, 69 F.4th 495 (8th Cir. 2023). Id. at 8. It described the Jackson decision as follows:

> Addressing an as-applied challenge to § 922(g)(1)'s constitutionality brought by a defendant convicted of state-law felonies for selling controlled substances, Jackson explained that Bruen "did not disturb" the Supreme Court's prior "assurances" that Heller and McDonald did not cast doubt on felon-dispossession laws; that "there is considerable support in the historical record" for a legislature's authority "to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society" as well as those who are "deemed more dangerous than a typical law-abiding citizen"; and that history "supports the constitutionality of § 922(g)(1) as applied to Jackson and other convicted felons, because the law is consistent with the Nation's historical tradition of firearm regulation."

Id. (quoting Jackson, 69 F.4th 501-06).

The government also referenced the Ninth Circuit's decision in United States v. Alaniz, 69 F.4th 1124 (9th Cir. 2023), which upheld a sentencing guideline that increased the base offense level by two "'[i]f a dangerous weapon (including a firearm) was possessed' during a drug offense." Id. The government explained that the Alaniz court had determined that this sentencing guideline did not violate the Second Amendment "because there is 'a longstanding tradition of enhancing a defendant's sentence for the increased risk of violence created by mere possession of a firearm during the commission of certain crimes' and that 'drug trafficking fits squarely within that category of crimes.'" Id. (quoting Alaniz, 69 F.4th at 1130). It conceded that the Third Circuit had held §922(g)(1) unconstitutional in an as-applied challenge, but argued that the

Range court itself had "emphasized that its 'decision . . . [was] a narrow one,'" applying 'only' to plaintiff Range 'given his violation of' a Pennsylvania misdemeanor statute criminalizing the making of a false statement to obtain food stamps." Id. at 9 (quoting Range, 69 F. 4th at 106). The government characterized Range as an "outlier-holding." Id.

The government argued that "felons disqualified from possessing firearms under Section 922(g)(1) are not among 'the people' protected by the Second Amendment." Id. at 11. It contended that "[t]he people" is "a term of art employed in select parts of the Constitution" to refer to "a class of persons who are part of a national community." Id. at 11-12 (quoting Heller, 554 U.S. at 580). The government argued that "[t]he Second Amendment thus guarantees the right to bear arms only to 'members of the political community,' not to all persons." Id. at 12 (quoting Heller, 554 U.S. at 580). It asserted that felons "have forfeited their membership in the political community" and that "States have long denied felons the rights of members of the polity" such as "the right to vote," "the right to hold public office" and "the right to serve on juries." Id. at 12-13. The government also claimed that the scope of individuals considered to be included in "the people" may vary between provisions of the Constitution. Id. at 13. As an example, the government asserted that "noncitizens are not among 'the people' protected by the Second Amendment, but certain noncitizens are among 'the people' protected by the Fourth Amendment." Id. (citing Heller, 554 U.S. at 581; United States v. Verdugo-Urquidez, 494 U.S. 259, 265, 271-73

12

(1990)). The government reiterated that "felons disarmed under Section 922(g)(1) are not among 'the people' entitled to keep and bear arms." Id.

The government argued that "[e]ven if this Court were to conclude that the Second Amendment covers possession of firearms by felons, [the defendant] still cannot prevail under *Bruen* because § 922(g)(1) 'is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'" Id. at 13-14 (quoting Bruen, 142 S. Ct. at 2127). The government observed that "[i]n England before the Founding, felons had no right to keep and bear arms." Id. at 14 (citing 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *98 (1769)). The government noted that "[t]he standard penalty for a felony was death" and "[t]hat punishment extended even to non-violent felonies[.]" Id. at 14 (citing 4 BLACKSTONE, COMMENTARIES *4, *155-56, *162). It explained that "[a] felon awaiting execution would be held in prison—where he would have no access to arms" and further that "[a] conviction would also usually result in the escheat of the felon's estate and the forfeiture of all his goods and chattels—including, of course, his arms." Id. (citing 4 BLACKSTONE, COMMENTARIES *131, *379-82). The government explained that a convicted felon "was deemed 'already dead in law' even before his execution" and "[t]hat status, known as 'civil death,' involved 'an extinction of civil rights, more or less complete.'" Id. (citing 4 BLACKSTONE, COMMENTARIES *374; Avery v. Everett, 18 N.E. 148, 150 (N.Y. 1888)).

The government argued that "[e]arly Americans accepted that legislatures had the power to subject felons to similar deprivations" as those imposed in

13

England. Id. It explained that "death was 'the standard penalty for all serious crimes' at the time of the founding[,]" and that "the death penalty extended even to non-violent crimes, such as forgery and horse theft." Id. (quoting Bucklew v. Precythe, 139 S. Ct. 1112, 1122 (2019) (citing Medina v. Whitaker, 913 F.3d 152, 158 (D.C. Cir.), *cert. denied*, 140 S. Ct. 645 (2019))). The government asserted that "[m]any States also subjected certain felons to the complete forfeiture of their estates or their goods and chattels[,]" and that "at least some States enacted statutes carrying forward the common-law doctrine of civil death." Id. (citing Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 CAL. L. REV. 277, 332 nn. 275-76 (2014); In re Deming, 10 Johns. 232, 233 (N.Y. 1813)).

The government stated that "[b]ecause the traditional punishment for serious crimes was death, early legislatures had little occasion to enact laws explicitly disarming persons convicted of such crimes," but that "[t]hey did, however, enact laws disarming persons who had committed certain offenses that were not punishable by death." Id. at 15. The government observed that "in 1775, Connecticut enacted a statute providing that a person who was convicted of 'libel[ing] or defam[ing]' certain colonial resolutions 'shall be disarmed and not allowed to have or keep any arms.'" Id. at 15-16 (quoting *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 193 (Charles J. Hoadly ed., 1890)). The government argued that "[t]he fact that legislatures disarmed individuals who committed those offenses suggests, *a fortiori*, the constitutionality of disarming those who commit felonies." Id. at 16.

14

The government contended that "[b]y the time the Second Amendment was ratified in 1791, there was an established tradition of legislatures exercising broad authority to disqualify people categorically from possessing firearms based on a judgment that certain groups simply could not be trusted to adhere to the rule of law." Id. at 16. The government cited various laws from England and colonial America aimed at disarming certain groups—Catholics, Native Americans, Black people and those who refused to swear loyalty to the new government—whom authorities believed could not be trusted to adhere to the rule of law. Id. at 16-28.

Starting with examples from England, the government stated that "[a]mong the limits well-established in England was the authority to disarm classes of people who, in the legislature's view, could not be relied upon to obey the rule of law." Id. at 16-17. The government observed that, following the Glorious Revolution of 1688, England's newly established Protestant government enacted a statute disarming "Catholics who refused to renounce their faith (and thus their allegiance to the Pope)." Id. at 17 (citing Range, 69 F.4th at 121-22 (Krause, J., dissenting); Jackson, 69 F.4th at 502). The government contended that "[t]his prohibition was not based on a theory that all Catholics were dangerous; rather, the categorical disarmament was based on a concern with a group's propensity to disobey the sovereign." Id. (citing Range, 69 F.4th at 121-22 (Krause, J., dissenting); Heller, 554 U.S. at 592-93; Kanter v. Barr, 919 F.3d 437, 456–58 (7th Cir. 2019) (Barrett, J., dissenting)). The government claimed that the legislation disarming Catholics is

15

"particularly relevant because the same Parliament wrote the 1689 English Bill of Rights, which 'enshrined basic civil liberties' and became the predecessor to our Second Amendment." Id. at 19 (citing Bruen, 142 S. Ct. at 2141; Heller, 554 U.S. at 593; Atkinson, 70 F.4th at 1031 (Wood, J., dissenting)).

Turning to colonial America, the government argued that "[t]he American colonies inherited the English tradition of broad legislative authority to disarm classes of people who were not dependable adherents to the rule of law." Id. The government recounted that "firearm regulations directed toward disarming Native Americans and Black people were pervasive," and argued that "[w]hile some of these categorical prohibitions of course would be impermissible today under other constitutional provisions, they are relevant here in determining the historical understanding of the right to keep and bear arms." Id. at 19-20 (quoting Jackson, 69 F.4th at 503). The government explained that "[t]he colonies also disarmed full-fledged members of the political community—i.e., free, Christian, white men—'whom the authorities believed could not be trusted to obey the law.'" Id. at 20 (quoting Range, 69 F.4th at 122 (Krause, J., dissenting)). As an example, the government recounted that Massachusetts had "disarmed the supporters of an outspoken preacher in the 1630s 'not because those supporters had demonstrated a propensity for violence,' but because 'the authorities concluded their conduct evinced a willingness to disobey the law.'" Id. (quoting Range, 69 F.4th at 123 (Krause, J., dissenting)).

The government contended that this trend continued into the Revolutionary War period, during which "American legislatures passed

16

numerous disarmament laws targeting those who failed to demonstrate loyalty to the emerging American government." Id. at 21. The government stated, "[i]n 1776, the Continental Congress recommended that colonial governments disarm those who were 'notoriously disaffected to the cause of America' or who simply 'have not associated' with the colonial governments in the war effort," and subsequently "[a]t least six of the colonies enacted legislation in this vein." Id. (quoting 4 *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776)). The government asserted that "[m]any of these laws provided that failing or refusing to take the oath resulted in forfeiture of a bundle of additional political rights, including the rights to vote, to serve on juries, and to hold public office—further reinforcing the longstanding connection between arms-bearing and these related rights." Id. at 22. It observed that one representative law from Pennsylvania "had the effect of depriving 'sizable numbers of pacifists' of the right to bear arms 'because oath-taking violated the religious convictions of Quakers, Mennonites, Moravians, and other groups.'" Id. (quoting Range, 69 F.4th at 125 (Krause, J., dissenting)).

The government contended that "[t]he history behind the Second Amendment's adoption provides additional persuasive evidence that the founders understood the individual right to bear arms to be compatible with broad legislative authority to disarm groups who could not be trusted to follow the law." Id. at 23. The government recounted that the Heller Court found the Antifederalists' objection to the original Constitution's "lack of a Bill of Rights"

17

to be "highly influential." Id. (citing Heller, 554 U.S. at 604). It observed that, although the Antifederalists did not persuade a majority of the convention to reject ratification on this basis, their principal objections ultimately were vindicated four years later through the adoption of the Bill of Rights. Id. (citing 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 628 (1971)). It recounted that several proposed drafts describing the right to bear arms included language warning that the right may be forfeited because of "crimes committed." Id. at 23-24 (quoting Schwartz, *The Bill of Rights: A Documentary History* 665). The government conceded that "the Second Amendment, as adopted, does not include the same language as these proposals," but contended that "it would have been 'obvious' to the founders that certain groups, including 'the felon' . . . could properly be subject to disarmament laws consistent with the 'pre-existing right' that was 'codified' in the Second Amendment." Id. at 24 (citing Bruen, 142 S. Ct. at 2127).

In summarizing its historical analysis, the government addressed the questions the Atkinson panel had posed to aid courts in applying the Bruen framework. Id. at 25 (citing Atkinson, 70 F.4th at 1023-24). The government argued that "§ 922(g)(1) addresses a 'general societal problem that has persisted since the 18th century' in that the statute relates to the disarmament of individuals who, like felons, are untrustworthy adherents to the rule of law." Id. It contended that before and around the time of the country's founding there were pervasive regulations that "prioritized social order and respect for the law over a pre-existing right to self-defense." Id. at 26. The government

asserted that even though some of these previous regulations did not apply to felons specifically, the court should "remain mindful of *Bruen*'s admonition that 'analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*' and '[s]o even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.'" Id. at 26-27 (quoting Bruen, 142 S. Ct. at 2133) (emphasis in original). The government argued that, "although [it] has emphasized the historical rationale for disarming groups perceived as an overall threat to the social order, a historical rationale for disarmament based on perceived danger supplies another helpful analogue." Id. at 27. The government quoted the Jackson court, which said that "'[l]egislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable *risk of danger* if armed,' not based on 'an individualized determination of dangerousness as to each person in a class of prohibited persons.'" Id. (quoting Jackson, 69 F.4th at 504) (emphasis in original).

The government argued that the court should reject any "as-applied" constitutional challenge. Id. at 28. First, the government contended that the "Seventh Circuit has never actually upheld an 'as applied' Second Amendment challenge to § 922(g) and has, in fact, 'repeatedly rejected as-applied Second Amendment challenges' to that statute." Id. (quoting Kanter v. Barr, 919 F.3d 437, 443 (2019)). Second, the government asserted that the defendant had

"proffered no historical evidence to support a position that the constitutionality of § 922(g)(1) turns on individualized assessments" and that instead "the historical tradition supports the legislature's ability to disarm categories of individuals." Id. at 29 (citing Atkinson, 70 F.4th at 1035 (Wood, J., dissenting)). Third, it argued that the defendant "has proffered no historical evidence to support a position that, even assuming the historical tradition supports disarming only 'dangerous' individuals, the definition of 'dangerous' is limited to the use, attempted use, or threatened use of force." Id. at 30 (citing Atkinson, 70 F.4th at 1024). Fourth, the government maintained that "[a] regime of individualized as-applied challenges to Section 922(g)(1) would distort the separation of powers," in effect allowing courts to "usurp the Executive Branch's role of deciding when to make 'exceptions' to the 'rigor' and 'severity' of the 'criminal code' enacted by Congress." Id. at 31 (citing The Federalist No. 74, at 501 (Alexander Hamilton) (Jacob E. Cooke ed. 1961)). Finally, the government argued that individualized, as-applied challenges would treat the right to possess arms differently from other rights, such as voting rights and jury service, that convicted persons forfeit upon their conviction. Id.

3. *Defendant's Reply (Dkt. No. 63)*

The defendant reiterated that his conduct is covered by the Second Amendment and argued that the government cannot carry its burden to establish that §922(g)(1) is consistent with the nation's historical tradition of firearm regulation. Dkt. No. 63 at 1 (citing Bruen, 142 S. Ct. at 2127). The defendant stated that the government's "leading argument is that the

20

overwhelming majority of courts to confront *Bruen* challenges like [the defendant]'s have upheld the constitutionality of § 922(g)(1)." Id. The defendant characterized that argument as "true, but not particularly helpful[]" because "[t]his challenge is not a sporting event to be decided by which side has the most points." Id. The defendant contended that this court must decide this case based on the roadmap provided in Bruen and Atkinson. Id. (citing Bruen, 142 S. Ct. 2111; Atkinson, 70 F. 4th 1018).

The defendant disputed the government's argument that he is not part of "the people" protected by the Second Amendment. Id. at 4. The defendant contested the government's comparison of felons to non-citizens in relation to the Second Amendment. Id. The defendant argued that "[t]he term 'the people' is 'a term of art employed in select parts of the Constitution[,]' . . . [that] 'refers to a class of persons who are part of a national community or *who have otherwise developed sufficient connection with this country to be considered part of that community.*'" Id. at 5 (quoting United States v. Verdugo-Urquidez, 494 U.S. 259, 265 (1990)) (emphasis in original). The defendant argued that the Supreme Court's recent Second Amendment cases further support this interpretation of "the people." Id. (citing Heller, 554 U.S. at 581; Bruen, 142 S. Ct. at 2156). The defendant asserted that "while most courts have rejected *Bruen* challenges to § 922(g)(1), many of those courts have rejected the government's argument that felons are excluded from the Second Amendment's protection." Id. He observed that "those courts—including other courts in this district—have generally ruled for the government based on *Bruen's* second

21

inquiry." Id. (citing United States v. Denruyter, Case No. 23-CR-155, 2023 WL 8098783, at *4 (E.D. Wis. Oct. 17, 2023), report and recommendation adopted, Case No. 23-CR-155, 2023 WL 8081658 (E.D. Wis. Nov. 21, 2023)).

Turning to Bruen's second step, the defendant explained that "[t]he parties agree that Section 922(g)(1) addresses a 'general societal problem that has persisted since the 18th Century.'" Id. at 6 (quoting Dkt. No. 61 at 25). The defendant argued, however, that "[b]ecause the problem that Section 922(g)(1) addresses is not new, the government must identify a 'distinctly similar historical regulation addressing that problem.'" Id. (quoting Bruen, 142 S. Ct. at 2131). The defendant asserted that "[t]o show a tradition of distinctly similar regulation, the government would have to demonstrate that there were historical laws that permanently denied felons the right to bear arms." Id.

The defendant contended that the government had failed to show a "distinctly similar historical regulation" because "[i]t [did] not cite[] an example of a single historical law that permanently abridged felons' right to bear arms." Id. (citing United States v. Bullock, Case No. 18-CR-165, 2023 WL 4232309, at *31 (S.D. Miss. June 28, 2023)). The defendant asserted that the government had avoided "discussing the (non-existent) history of felon disarmament" and instead had "attempt[ed] to assert that Section 922(g)(1) is 'relevantly similar' to *other* firearms restrictions that existed at the time of the founding—such as laws that prohibited Catholics and British loyalists from possessing firearms." Id. at 6-7. (emphasis in original). The defendant asserted that this so-called "relevantly similar" test is "the wrong standard" and that "[o]nly a 'distinctly

22

similar' law" would satisfy the government's burden. Id. at 7. The defendant claimed that even if the court were to apply what he characterized as the "less exacting standard[,]" the governments' historical evidence is not "relevantly similar." Id. The defendant summarized his argument by saying, "the government cannot succeed under . . . the correct 'distinctly similar' standard . . . [or] the more relaxed 'relevantly similar' test." Id.

Starting with what the defendant characterized as the "distinctly similar" standard, he argued that "the Court's historical analysis must focus on the specific question of whether felons were traditionally deprived of the right to bear arms." Id. The defendant asserted that "[i]n applying the 'distinctly similar' test, the Court should 'count silence as evidence that the public did not approve of such a regulation . . . when the public experienced the harm the modern-day regulation attempts to address.'" Id. at 8. (quoting United States v. Daniels, 77 F.4th 337, 344 (5th Cir. 2023)). He argued that "[w]here silence provides direct evidence about the lack of a historical tradition, there is no need to engage in an ill-defined and speculative 'analogical' inquiry." Id. Applying this reasoning, the defendant contended that, "[i]n this case, the historical silence on the issue of disarming felons speaks volumes" because "[f]elons existed in 1791, as did the problem of recidivism." Id. (citing Jeffrey K. Sawyer, "Benefit of Clergy" in Maryland and Virginia, 34 AM J.L. HIST. 49, 62 (1990)). The defendant concluded that "the 'Founders themselves could have adopted' laws like Section 922(g)(1) to 'confront' the 'perceived societal problem'

posed by felons' access to guns . . . [b]ut they declined to do so." Id. (quoting Bruen, 142 S. Ct. at 2131).

The defendant summarized his argument regarding the so-called "distinctly similar" standard by stating that "[t]he reason that the government has failed to cite any historical laws restricting firearm possession by felons is that no such laws existed." Id. (citing Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous,"* 25 TEX. REV. L. & POLS. 245, 291 (2021)). The defendant observed that "Section 922(g)(1) is not even 100 years old" and that its original version, passed in 1938, "covered only a few violent offenses[.]" Id. at 9 (citing United States v. Skoien, 614 F.3d 638, 640 (7th Cir. 2010); United States v. Booker, 644 F.3d 12, 24 (1st Cir. 2011)). He asserted that "[n]ot until 1961 did Congress amend the statute to cover receipt by 'all felons,'" and that "Section 922(g)(1) 'is firmly rooted in the twentieth century' and 'bears little resemblance to laws in effect at the time the Second Amendment was ratified.'" Id. (citing Skoien, 614 F.3d at 640; Booker, 644 F.3d at 24). The defendant summed up by asserting that "[b]ecause the historical record demonstrates that felons were not permanently denied the right to bear arms before the twentieth century, the government has failed to establish the existence of a historical tradition that is 'distinctly similar' to Section 922(g)(1)." Id.

Transitioning to the so-called "relevantly similar" standard, the defendant argued that "[e]ven if the Court applies the less exacting 'relevantly similar' standard, the government has failed to meet it." Id. The defendant

characterized the government's approach as "lump[ing] together wildly disparate historical regulations in an attempt to invent a tradition that would allow the state to disarm anyone who it deemed to be 'untrustworthy adherents to the law,' or who it thought presented 'an overall threat to the social order.'" Id. at 10 (quoting Dkt. No. 61 at 25, 27). He contended that the Bruen Court had rejected a similar attempt to "defin[e] a historical tradition at th[e] stratospheric level of generality." Id. (citing Bruen, 142 S. Ct. at 2133). He described the government's designation of "untrustworthy adherents to the law" as "'a mushy standard that sets no limit' at all." Id. at 10-11 (quoting Folajtar v. Att'y Gen. United States, 980 F.3d 897, 912 (3rd Cir. 2020) (Bibas, J., dissenting)). The defendant argued that "the Court should not—and cannot—engage with the government's proffered analogies by generalizing away the specific content of the historical laws at issue," and instead asserted that the court "must use Bruen's 'why' and 'how' analysis to assess whether the Founding-era restriction is relevantly similar to the modern one." Id. at 11 (quoting Daniels, 77 F. 4th at 354).

The defendant argued that the court should reject the government's "attempt[] to analogize Section 922(g)(1) to a variety of English and colonial-era laws that disarmed racial, religious, and political minorities." Id. The defendant asserted that "[t]he government's proposed analogies fail on both of the metrics that the Supreme Court set out in Bruen." Id. at 12. "[A]s to the how[,]" the defendant contended that "each of the government's proffered analogues was significantly less burdensome on the right to bear arms than the total and

25

permanent firearm ban set out in Section 922(g)(1)[]" because "[n]ot one of the laws cited by the government imposed a total, permanent ban on firearms possession." Id. "[A]s to the why[,]" the defendant claimed that "the purpose and function of these historical laws were far different from the modern Section 922(g)(1)" because they were "targeted at groups excluded from the political community—i.e., written out of 'the people' altogether—as much as they were about curtailing violence or ensuring the security of the state." Id. at 12-13 (quoting United States v. Rahimi, 61 F.4th 443, 457 (5th Cir. 2023)). The defendant observed that "each of the laws cited by the government aimed to disarm groups that the founders either regarded as subhuman or as actively engaged in organized sedition." Id. at 13.

The defendant analyzed the specific, category-based restrictions the government had identified. Id. at 13-17. Starting with the English laws disarming Catholics that followed the Glorious Revolution, the defendant recounted that these laws had restoration provisions and self-defense exceptions. Id. at (citing Wm. & Mary., Sess. 1, ch. 15, in 6 *Statutes of the Realm* 71 at 72). The defendant observed that "[i]n the time after the restoration of the Protestant monarchy, Catholics were regarded—not just as generically untrustworthy—but as seditious enemies of the state[,]" so the "law was specifically to prevent insurrection." Id. at 13-14 (citing Clement Fatovic, *The Anti-Catholic Roots of Liberal and Republican Conceptions of Freedom in English Political Thought*, 66 J. Hist. Ideas 37, 43 (2005)). Regarding "the pervasiveness of colonial laws that disarmed Native Americans and Black

people[,]" the defendant argued that these laws "do nothing to advance the government's argument;" "[r]ather, they reinforce the idea that the founders tried to disarm those they viewed as subhuman." Id. at 14.

Moving to the Revolutionary War measures, the defendant argued that "[p]eople disarmed under these wartime statutes could regain their right to bear arms at any time simply by swearing a loyalty oath[,]" and that "[t]he loyalty statutes were a wartime measure that aimed to neutralize Loyalists who might rebel or otherwise undermine the stability of government." Id. at 15 (citing Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 L. & HIST. REV. 139, 157 (2007); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 506–07 (2004)). Based on these distinctions, the defendant argued that the laws the government had cited "were not justified by a generic power to disarm the 'untrustworthy' or even the 'dangerous.'" Id.

The defendant contended that the court should reject the government's reliance on "failed proposals from the Massachusetts, Pennsylvania, and New Hampshire constitutional ratifying conventions[]" that had suggested language limiting the right to bear arms to "peaceable citizens" and the like. Id. at 16. The defendant observed that "none of these proposals became law" and that "when the Second Amendment was promulgated and ratified, its drafters did not include any of the restrictive language from these earlier proposals." Id. (citing Rahimi, 61 F.4th at 457). The defendant maintained that "even if failed

27

proposals could support the government's argument, *Bruen* expressly instructs judges to 'doubt that three colonial regulations could suffice to show a tradition' of gun regulation." Id. at 17 (quoting Bruen, 142 S. Ct. at 2142, 2153). The defendant asserted that "[t]he three failed proposals at issue here provide even less support than the enacted regulations considered in *Bruen*." Id.

The defendant argued that "[t]he mere existence of the death penalty does not authorize the government to permanently strip away a person's fundamental rights after the completion of a sentence." Id. He stated that "the government's argument rests on the premise that the power to impose the death penalty necessarily implies a lesser power to let somebody live but permanently deprive them of their fundamental rights[,]" but that asserted that "this premise is wrong—both as a matter of historical practice and as a matter of constitutional law." Id. The defendant maintained that "the American states did not automatically punish felons with the death penalty" and that "[f]ewer than one quarter of felony convictions resulted in the death penalty." Id. at 17-18 (citing Kanter, 919 F.3d at 459 (Barrett, J., dissenting); Javier Bleichmar, *Deportation as Punishment: A Historical Analysis of the British Practice of Banishment and Its Impact on Modern Constitutional Law*, 14 GEO. IMMGR. L.J. 115, 126 (1999)). He asserted that historical records demonstrate "that, in cases where the death penalty was not imposed, 'the rights of felons serving less than life were merely *suspended* during the term of the sentence.'" Id. at 18 (quoting Bleichmar, 14 GEO. IMMGR. L.J. at 126) (emphasis in original). The

28

defendant disputed "the government's underlying premise—that anyone who could be subject to death is necessarily subject to the permanent deprivation of their fundamental rights," which he contended "would apply with equal force in the context of the First Amendment, the Due Process Clause, or any other provision of the Constitution." Id. The defendant observed that "[i]n the context of other enumerated constitutional rights, courts have had no trouble resisting this kind of pernicious reasoning." Id. at 19 (citing Kanter, 919 F.3d at 461-62 (Barrett, J., dissenting)).

The defendant concluded by addressing the five questions the Seventh Circuit had posed in Atkinson to guide courts applying the Bruen framework. Id. at 20 (citing Atkinson, 70 F.4th at 1023). First, the defendant argued that "[c]rime and recidivism are age-old problems," but argued that, "[d]espite that, the government has produced no evidence to suggest that the founding generation ever attempted to permanently disarm felons." Id. The defendant asserted that "earlier generations addressed this persistent problem through materially different means than Section 922(g)(1)." Id. Second, the defendant claimed that "[t]he best—and uncontested—historical evidence demonstrates that felons were not permanently forbidden from possessing firearms at any time before the middle of the twentieth century." Id. Third, he reiterated that the historic analogues the government had referenced—which the defendant described as "laws that restricted (but did not totally ban) access to firearms for enslaved people, Indians, religious minorities, and British loyalists"—were not designed to restrict the rights of those deemed "untrustworthy" or "dangerous."

29

Id. at 21. Rather, the defendant asserted that these laws "were directed at those who were outsiders, either because they were considered sub-human or because they were considered to be potentially seditious enemies of the state." Id. at 21. Fourth, the defendant argued that "[t]he government has not identified any analogous laws" to support §922(g)(1) and that "this motion should be decided—not by the government's elaborate and strained analogies— but by considering the specific tradition of how felons were treated after the completion of their sentences." Id. Fifth, he argued that "the government has failed to demonstrate that the historical record supports disarmament based on 'dangerousness[,]'" but contended that "[i]f the Court were to go down that road, it would have to consider the specific kinds of dangerousness that led to disarmament at the time of the founding." Id. at 22. The defendant emphasized that "the historical evidence suggests that the Founding generation was concerned about the danger of organized insurrection, and that they responded to that danger by imposing temporary and conditional firearms disqualifications[,]" not that the founding generation was worried about "[t]he danger posed by non-political street (or traffic) crime[.]" Id.

     B.    <u>Judge Dries's Report and Recommendation</u> (Dkt. No. 68)

Judge Dries reviewed the parties' arguments and historical evidence, then recommended that this court dismiss the defendant's motion because §922(g)(1) is constitutional under <u>Bruen</u>. Dkt. No. 68. After applying <u>Bruen</u>'s framework, Judge Dries opined that, "[a]lthough the Constitution presumptively protects [the defendant's] conduct, the government has met its

burden of demonstrating that § 922(g)(1) is consistent with the United States' historical tradition of firearm regulation." Id. at 1.

Judge Dries first found that the Second Amendment presumptively protects the defendant's conduct. Id. at 7. He remarked that "[w]hether 'the people' for purposes of the Second Amendment includes only law-abiding citizens 'is currently subject to a lively debate among federal jurists.'" Id. at 5 (quoting United States v. Posey, Case No. 22-CR-83, 655 F. Supp. 3d 762, 770 (N.D. Ind. Feb. 9, 2023)). Judge Dries observed that, "[d]espite language seemingly linking Second Amendment rights to the concept of 'law-abiding,' 'responsible,' or 'ordinary' citizens, the Supreme Court has not decided the issue." Id. (citing Atkinson, 70 F.4th at 1023). Judge Dries opined that "[t]he Seventh Circuit has provided mixed signals" on this topic and that "post-*Bruen*, the other appellate courts have divided as well." Id. at 5-6. He stated that "[t]he answer to this debate likely won't change the outcome of any Second Amendment challenge, and it wouldn't in this case." Id. at 6. Judge Dries cited then-Judge Barrett, who had "recognized [that] two approaches—(1) that certain groups, like felons, fall entirely outside the amendment's scope and (2) that all Americans have Second Amendment rights but that a historical tradition supports Congress's authority to strip certain groups of that right—'will typically yield the same result.'" Id. (quoting Kanter, 919 F.3d at 451-53 (Barrett, J., dissenting)). Judge Dries concluded that "absent further guidance from the Supreme Court or the Seventh Circuit, [he] w[ould] assume that convicted felons are included among 'the people' entitled to Second Amendment

31

protections[,]" and thus that the Second Amendment presumptively protects the defendant's conduct. Id. at 6-7.

Turning to the historical tradition prong of Bruen, Judge Dries summarized the historical evidence the government had presented and addressed the defendant's critiques of that evidence. Id. at 7-13. He concluded that "[t]he pertinent question . . . is what the Founders understood the Second Amendment to mean." Id. at 7 (quoting Atkinson, 70 F.4th at 1020). Judge Dries stated that, "[t]o carry its burden, the Government must point to 'historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation.'" Id. (quoting Rahimi, 61 F.4th at 454).

Judge Dries first addressed the defendant's argument "criticiz[ing] the government for failing to demonstrate a longstanding tradition of permanently disarming non-violent felons." Id. at 8. He recounted that "*Bruen* requires the government to identify only 'a well-established and representative historical *analogue*, not a historical *twin*[,]'" so "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." Id. (quoting Bruen, 142 S. Ct. at 2133) (emphasis in original). Judge Dries observed that "[the defendant] provides no historical evidence suggesting that the constitutionality of § 922(g)(1) turns on individualized assessments of violence" and cited the Jackson court in saying that "'[h]istory demonstrates that there is no requirement for an individualized determination of dangerousness as to each person in a class of prohibited

32

persons.'" Id. (quoting Jackson, 69 F.4th at 504). Judge Dries found that "the historical evidence supports broad legislative discretion to disarm entire categories of individuals." Id. (citing Jackson, 69 F.4th at 502–04).

Judge Dries next discussed the defendant's critique that the government had not provided a "distinctly similar historical regulation" for a statute addressing "a general societal problem that has persisted since the 18th century[.]" Id. at 8-9. He observed, "both parties indicate that § 922(g)(1) targets a general societal problem that has existed since before the founding" but "they disagree on what that problem is." Id. at 9. Judge Dries stated that the defendant "says the statute addresses crime and recidivism," which Judge Dries characterized as technically correct but "overbroad." Id. He recounted that "[t]he government says the statute relates to the disarmament of individuals who are untrustworthy adherents to the rule of law." Id. He opined that the government's characterization "also may be true, but again, [does not] sufficiently capture[] the specific societal problem Congress tried to curb in enacting § 922(g)(1)." Id. Finding neither party's description of the social problem conclusive, Judge Dries found that "the question about what societal problem the statute targets remains unresolved." Id. (citing Atkinson, 70 F.4th at 1023).

Judge Dries engaged in his own analysis of "'the text, structure, and purpose'" of §922(g)(1) to discern the social problem it addressed. Id. at 9-10 (quoting Range, 69 F.4th at 139 (Roth, J., dissenting)). He observed that "[s]ection 922(g)(1) makes it unlawful for any person who has been convicted of

33

a crime punishable by more than a year in prison to 'possess *in or affecting commerce*, any firearm or ammunition.'" Id. at 10 (emphasis in original). He opined that "[t]he jurisdictional element was key[.]" Id. (citing Federal Firearms Act, Pub. L. No. 75-785, 52 Stat. 1250 (1938)). Judge Dries determined that "the societal problem addressed by § 922(g)(1) is the possession of firearms *in interstate commerce* by particular 'channels of commerce'—those channels under the language of § 922(g)(1) being individuals with certain criminal convictions." Id. (quoting Range, 69 F.4th at 140 (Roth, J., dissenting)) (emphasis in original). Judge Dries concluded that "[t]he possession of firearms in interstate commerce was not a general societal problem that existed in the 18th century[,]" and so "to the extent the Supreme Court intended to articulate two separate tests for considering the government's historical evidence—one for longstanding societal problems ('distinctly similar') and the other for unprecedented societal problems ('relevantly similar')—the latter test applies here." Id.

Judge Dries observed that "the Seventh Circuit has yet to decide a post-*Bruen* challenge to the constitutionality of § 922(g)(1)," then evaluated the Eighth Circuit's decision in Jackson and the Third Circuit's decision in Range. Id. at 11-12. Regarding Jackson, Judge Dries explained that "the Eighth Circuit recently rejected a challenge almost identical" to the defendant's "after considering much of the same historical evidence the government presents here." Id. at 11 (citing Jackson, 69 F.4th at 502-05). After distinguishing the Range court's reasoning, Judge Dries concluded:

34

Like the Eighth Circuit in *Jackson*, I find that § 922(g)(1) is consistent with the nation's historical tradition of imposing broad, status-based firearm restrictions on categories of individuals who could not be trusted to obey the law or who were deemed dangerous. Those laws, like the federal felon-in-possession statute, disarmed specific groups in order to preserve social order. And while the burden faced by felons like [the defendant] may seem more severe at first glance, the prohibition on possessing a firearm or ammunition is not necessarily permanent. Convictions that have been expunged or set aside or for which a person has been pardoned or had civil rights restored do not result in any restriction on the right to keep and bear arms. *See* 18 U.S.C. § 921(a)(20). Likewise, although currently unfunded by Congress, the statute provides a mechanism to restore a convicted felon's gun rights. *See* 18 U.S.C. § 925. Section 922(g)(1) therefore may not [be] a dead ringer for the government's proffered historical precursors, but it is still analogous enough to pass constitutional muster.

Id. at 12. Judge Dries explained that his "conclusion is far from an outlier" and that "[n]early every district court that has considered the constitutionality of § 922(g)(1) post-*Bruen* has found the statute comports with the Second Amendment." Id.

C.    Briefing Before This Court

1.    *Defendant's Objection (Dkt. No. 69)*

While the defendant agrees with Judge Dries's determination that the Second Amendment's plain text covers his conduct, he disputes the judge's determination that the government satisfied its burden of showing that §922(g)(1) is consistent with the nation's historical tradition of firearm regulation. Dkt. No. 69 at 2. The defendant objects to Judge Dries's conclusion that "while § 922(g)(1) wasn't 'a dead ringer' for the government's proffered comparisons, it was 'analogous enough' to satisfy the government's burden of

35

showing that § 922(g)(1) was consistent with the nation's historical tradition of firearm regulation." Id.

The defendant provides the court with "the context in which [he] brings this motion[,]" namely, that he "is one of hundreds of felons currently challenging the constitutionality of § 922(g)(1) both facially and as applied to them." Id. He asserts that "[s]imilar prohibitions are being challenged in state courts around the country[,]" and that "[m]any courts have agreed that the felon-in-possession laws violates [sic] the Second Amendment." Id. The defendant concedes that "[m]ore [courts] have not" agreed that the felon-in-possession laws violate the Second Amendment, but explains that there is still "a circuit split on the issue" which the Supreme Court is primed to address in short order. Id. The defendant explains that his "motion is brought in part to preserve this argument should the Supreme Court follows its own roadmap and find § 922(g)(1) unlawful." Id.

The defendant argues that Judge Dries "deviated from the guidance provided by the Seventh Circuit in Atkinson[.]" Id. (citing Atkinson, 70 F.4th 1018). He asserts that all the questions posed in Atkinson "support the conclusion that 922(g)(1), especially as applied to ammunition charges like the one here, is inconsistent with the nation's history of firearm regulation." Id. at 3. The defendant contends that Judge Dries's "analysis went off course at the first question[,]" which asks "whether § 922(g)(1) addressed 'a general societal problem that has persisted since the 18th century' and if so, 'did earlier generations address it with similar or materially different means.'" Id. (quoting

36

<u>Atkinson</u>, 70 F.4th at 1023). The defendant recounts that "[t]he parties agreed that § 922(g)(1) addresses a general societal problem that has persisted since the 18th century." <u>Id.</u> The defendant complains that despite the parties' agreement, Judge Dries "somehow concluded, without identifying any support, that the parties were wrong, and that § 922(g)(1) was a response to 'unprecedented societal concerns or dramatic technological changes' and thus the government only needed to show 'relevantly similar' historical analogues." <u>Id.</u>

The defendant disputes Judge Dries's conclusion that "922(g)(1) was 'analogous enough' to 'the nation's historical tradition of imposing broad, status-based firearm restrictions on categories of individuals who could not be trusted to obey the law or who were deemed dangerous.'" <u>Id.</u> at 4. He asserts that "[t]he premise of [Judge Dries's] conclusion is incorrect." <u>Id.</u> The defendant contends that, "[a]s the parties agreed, §922(g)(1) is a response to 'a general societal problem that has persisted since the 18th century[,]'" which "requires the government to demonstrate 'distinctly similar' regulations." <u>Id.</u> He argues that the government has failed to meet this burden because it "has failed to show any instance of the nation ever permanently disarming felons." <u>Id.</u> The defendant asserts that "[w]hile religious and ethnic minorities and suspected seditionists were regularly restricted in their access to firearms, they were never fully and permanently disarmed." <u>Id.</u>

The defendant summarizes his argument by stating, "[t]he historical record demonstrates that laws prohibiting non-violent felons from possessing

arms did not appear until the 20th Century" and that, "[a]t the time that the Second Amendment was ratified, there were not any felon-in-possession laws on the book, nor were there any other firearms restrictions that were meaningfully similar to § 922(g)(1)." Id. The defendant concludes that, "[f]or those reasons, the Court should find that Section 922(g)(1) is unconstitutional as to [the defendant] and should grant his motion to dismiss." Id.

2.    *Government's Response (Dkt. No. 72)*

While the government disagrees with Judge Dries's determination regarding the first step in the Bruen analysis—that previously convicted felons fall within the Second Amendment's protection—the government agrees with his determination regarding the second step in the Bruen analysis—that §922(g)(1) is consistent with the nation's historical tradition of firearm regulation. Dkt. No. 72 at 1. The government states that because the second step in the Bruen analysis is dispositive, it does not object to Judge Dries's recommendation. Id.

The government contends that the historical arguments presented in its briefing before Judge Dries address the defendant's objection. Id. at 2. It adopts its previous arguments and "observe[s] that other judges in this District have denied defendants' motions to dismiss on materially indistinguishable grounds." Id. (citing United States v. Watson, Case No. 23-CR-109, 2023 WL 6623774, (E.D. Wis. Oct. 11, 2023) (Griesbach, J.); United States v. Johnson, 22-CR-254, 2023 WL 7284848 (E.D. Wis. Nov. 3, 2023) (Adelman, J.).

Although the government confirms that "it is correct that both parties agreed, as did Judge Adelman in *Johnson*, that Section 922(g)(1) addresses a 'general societal problem that has persisted since the 18th century,'" it opines that Judge Dries's focus on interstate travel is another legitimate approach to this issue. Id. The government contends that whether the problem §922(g)(1) addresses is defined as a "general societal problem" or an "unprecedented societal concern," Judge Dries correctly observed that "the historical evidence supports broad legislative discretion to disarm entire *categories* of individuals." Id. (emphasis in original). The government concludes that "[i]n demanding that examples of felon-in-possession laws be on the books when the Second Amendment was ratified, [the defendant] is ignoring *Bruen's* caution that 'even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.'" Id. at 2-3 (quoting Bruen, 142 S. Ct. at 2133).

## III.    Analysis

The Supreme Court's decision in Bruen altered the legal framework courts apply to Second Amendment challenges. Bruen, 142 S. Ct. 2125-26 (rejecting the "'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny," which "the Courts of Appeals ha[d] coalesced around"). The Bruen decision articulated the standard for reviewing Second Amendment challenges as follows:

> [T]he standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that

39

it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

Id. at 2129-30. In Atkinson, the Seventh Circuit recognized that "Bruen leaves no room for doubt: text and history, not a means-end analysis, now define the controlling Second Amendment inquiry." 70 F.4th at 1020. "Accordingly, when the Second Amendment's 'plain text' covers the regulated conduct, the government has only one way to defend the regulation—by proving that it is 'consistent with this Nation's historical tradition of firearm regulation.'" Id. (quoting Bruen, 142 S. Ct. at 2126).

At the time that the defendant filed his motion (and at the time he filed his objection to Judge Dries's report and recommendation), the Seventh Circuit Court of Appeals had not yet confronted the constitutionality of §922(g)(1) post-Bruen. As of the date of this order, it has not addressed that issue directly. But it has shed some light on how it might treat one of the issues the defendant raised before Judge Dries.

As detailed above, the defendant objected only to the portion of Judge Dries's report and recommendation that concluded the government had satisfied its burden of demonstrating §922(g)(1) is consistent with the nation's historical tradition of firearm regulation. Dkt. Nos. 68 at 13; 69 at 2-4. The defendant did not object to Judge Dries's determination that the Second Amendment's plain text protects him. Dkt. Nos. 68 at 13; 69 at 2. While the government did not object to Judge Dries's ruling on that issue, it observed that it was not doing so because it had prevailed in opposing the motion to

40

dismiss, and it stressed that it was not waiving its arguments that the Second Amendment did not protect the defendant. Dkt. No. 72 at 1.

In April 2024, the Seventh Circuit addressed on direct appeal an argument by a defendant convicted of violating 18 U.S.C. §922(g)(1) that his prosecution was "unconstitutional, root and branch," because "the Second Amendment permits persons with felony convictions to possess both firearms and ammunition, notwithstanding statutes such as 18 U.S.C. § 922(g)(1)." United States v. Gay, 98 F. 4th 843, 846 (7th Cir. 2024). The court addressed this argument as follows:

> This argument is hard to square with *District of Columbia v. Heller*, 554 U.S. 570 . . . (2008), which in the course of holding that the Second Amendment creates personal rights pointedly stated that "longstanding prohibitions on the possession of firearms by felons" are valid. *Id.* at 626, 635. . . . When extending *Heller* to the states, the Court in *McDonald v. Chicago*, 561 U.S. 742, 786 . . . (2010) (lead opinion), reassured readers that all of the reservations and provisos in the *Heller* opinion retain validity. And in the Court's most recent Second Amendment decision, *New York State Rifle and Pistol Association, Inc. v. Bruen*, 597 U.S. 1 . . . (2022), Justices Alito and Kavanaugh, whose votes were essential to the majority, wrote separately to say that *Bruen* did not change anything about *Heller*. See 597 U.S. at 72 . . . (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 80-81 . . . (Kavanaugh, J., joined by the Chief Justice, concurring) (endorsing the statement in *Heller* about the propriety of denying firearms to felons).

> One must not read decisions of the Supreme Court as if they were statutes. The Justices have yet to consider the question whether non-violent offenders may wage as-applied challenges to § 922(g)(1). One circuit has held that they may, in light of *Bruen*, and that someone whose most serious conviction is for a non-violent crime

that did not lead to even one day in prison retains a constitutional right to keep and bear arms. *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc), petition for certiorari pending under the name *Garland v. Range* (No. 23-374). Other circuits have disagreed with that conclusion in post-*Bruen* decisions. See, e.g., *United States v. Cunningham*, 70 F.4th 502, 506 (8th Cir. 2023); *Vincent v. Garland*, 80 F.4th 1197, 1199-1202 (10th Cir. 2023). We may assume for the sake of argument that there is *some* room for as-applied challenges, but that assumption does not assist Gay.

When describing the persons who possess rights under the Second Amendment, *Bruen* repeatedly used the phrase "law-abiding, responsible citizens" or a variant. E.g., 597 U.S. at 26, 70 . . . . Gay does not fit that description. He has been convicted of 22 felonies, including aggravated battery of a peace officer and possessing a weapon while in prison.

Gay was on parole after spending almost 25 years in confinement and had promised as part of the agreement to obtain his release that he would not possess a firearm. He violated that condition (in addition to violating the condition requiring him to report his residence). To repeat what we said above: Parole is a form of custody. Gay's sentences had not expired; all parole did was allow him to serve some of his sentences outside prison walls.

Just as *Samson* [*v. California*, 547 U.S. 843 (2006)] holds that parolees lack the same privacy rights as free persons, we conclude that parolees lack the same armament rights as free persons. Cf. *United States v. Perez-Garcia*, 96 F.4th 1166 (9th Cir. 2024) (person on bail awaiting trial lacks a constitutional right to carry firearms).

Instead of contesting §922(g)(1) through a declaratory-judgment action, as Range did, Gay violated the law in secret and tried to avoid detection. Cf. *United States v. Holden*, 70 F.4th 1015 (7th Cir. 2023). He fled from the police by car and on foot, and flight to avoid prosecution is a crime in most if not all states. No, Gay is not a "law-abiding, responsible" person who has a constitutional right to possess firearms.

Id. at 846-47.

As the court explained when laying out the legal standard for district

court review of an objection to a magistrate judge's report and

recommendation, the fact that the defendant did not object to Judge Dries's statement that, "absent further guidance from the Supreme Court or the Seventh Circuit, I will assume that convicted felons are among 'the people' entitled to Second Amendment protections," does not preclude this court from reviewing that conclusion. One could infer from Seventh Circuit's language in Gay that a defendant such as the one in this case—who, at the time he allegedly possessed ammunition, had five felony convictions, including a 2019 conviction for "knowingly flee[ing] or attempt[ing] to elude an officer after having received a visual or audible signal from the officer in such a way that interferes with or endangers the officer, the police vehicle, other vehicles, or pedestrians," dkt. no. 56 at 2—is not a "law-abiding, responsible" person who has a constitutional right to possess ammunition. Conceivably the Seventh Circuit could consider the defendant someone who is not eligible to make an as-applied challenge to §922(g)(1).

That said, the Seventh Circuit had not decided Gay at the time the defendant filed his motion to dismiss, or at the time Judge Dries issued his report and recommendation. And the defendant has made both an as-applied and a facial challenge to the constitutionality of §922(g)(1). Like Judge Dries, the court will assume for the sake of this decision that the defendant is a person protected by the Second Amendment. The court will review *de novo* the portions of Judge Dries's report and recommendation to which the defendant objected.

A.     <u>Historical Tradition Prong Generally</u>

The Second Amendment states:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. CONST. AMEND. II.

The <u>Bruen</u> Court held that if a person's conduct is covered by the plain text of the Second Amendment, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." <u>Bruen</u>, 142 S. Ct. at 2127. The Court provided instructions for how lower courts should approach "assess[ing] whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." <u>Id.</u> at 2131

The <u>Bruen</u> Court explained there are some cases where a court's historical "inquiry will be fairly straightforward." <u>Id.</u> "For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." <u>Id.</u> "Likewise," the Court stated, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." <u>Id.</u> The <u>Bruen</u> Court observed that the decision in <u>Heller</u> "exemplifies this kind of straightforward historical inquiry," because the <u>Heller</u> court analyzed a regulation intended to address the problem of

44

"'handgun violence,' primarily in 'urban area[s]'" by "consider[ing] whether 'historical precedent' from before, during, and even after the founding evince[d] a comparable tradition of regulation." Id. at 2131-32 (citing Heller, 554 U.S. at 631).

The Bruen Court explained that "[w]hile the historical analogies [in Bruen] and in Heller are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." Id. at 2132. It instructed that "[w]hen confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge." Id. The Bruen Court explained that, "[l]ike all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" Id.

Although the Bruen Court did not conduct an "exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," it observed that "Heller and McDonald point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." Id. at 2132-33.

> As we stated in *Heller* and repeated in *McDonald*, "individual self
> defense is 'the *central component*' of the Second Amendment right."
> *McDonald*, 561 U.S. at 767 . . . (quoting *Heller*, 554 U.S. at 599 . . .);
> see also [*Heller*, 554 U.S.], at 628 . . . ("the inherent right of self-
> defense has been central to the Second Amendment right.").
> Therefore, whether modern and historical regulations impose a
> comparable burden on the right of armed self-defense and whether

45

that burden is comparably justified are "'*central*'" considerations when engaging in an analogical inquiry. *McDonald*, 561 U.S. at 767 . . . (quoting *Heller*, 554 U.S. at 599 . . . ).

Id. at 2133.

The Court cautioned, however, that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." Id. It explained:

> On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Drummond v. Robinson*, 9 F.4th 217, 226 (CA3 2021). On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

Id.

B.     Post-*Bruen* Challenges to §922(g)(1)

"Since *Bruen*, courts have been inundated with litigation challenging the constitutionality of firearm regulation statutes, particularly § 922(g)[.]" Denruyter, 2023 WL 8098783, at *2, *report and recommendation adopted*, 2023 WL 8081658. Many of these challenges have focused on 18 U.S.C. §922(g)(1), which states:

> It shall be unlawful for any person— . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

46

See Range, 69 F.4th at 106 (holding §922(g)(1) unconstitutional as applied); Jackson, 69 F.4th at 505-06 (holding §922(g)(1) constitutional); Garland, 80 F.4th at 1202 (holding §922(g)(1) constitutional); Atkinson, 70 F.4th at 1022-24 (remanding constitutional challenge to §922(g)(1)).

Although since Bruen, other circuits have made definitive rulings regarding §922(g)(1)'s constitutionality (see Range, 69 F.4th at 106; Jackson, 69 F.4th at 505-06; Garland, 80 F.4th at 1202), as the court noted earlier, the Seventh Circuit has yet to directly address the issue. In Atkinson, however, that court provided guidance on how a district court may properly analyze a constitutional challenge to §922(g)(1) following Bruen. 70 F.4th at 1022-24. Although the Atkinson court remanded, because the case was filed before Bruen and "[t]he parties' briefing d[id] not grapple with Bruen[,]" id. at 1022, the court listed "[s]everal interrelated and non-exhaustive questions" which "may help focus the proper analysis on remand," id. at 1023-24. The court framed those questions as follows:

1. Does § 922(g)(1) address a "general societal problem that has persisted since the 18th century?" . . . If this problem existed during a relevant historical period, did earlier generations address it with similar or "materially different means?"

2. What does history tell us about disarming those convicted of crimes generally and of felonies in particular? Among other sources, the parties could look to commentary from the Founders, proposals emerging from the states' constitutional ratifying conventions, any actual practices of disarming felons or criminals more generally around the time of the Founding, and treatment of felons outside of the gun context (to the extent this treatment is probative of the Founders' views of the Second Amendment). When considering historical regulations and practices, the key question is whether those regulations and practices are comparable in substance to the restriction imposed by § 922(g)(1). To answer the question, the

47

district court and the parties should consider how the breadth, severity, and the underlying rationale of the historical examples stack up against § 922(g)(1)

3. Are there broader historical analogues to § 922(g)(1) during the periods that *Bruen* emphasized, including, but not limited to, laws disarming "dangerous" groups other than felons? The parties should not stop at compiling lists of historical firearms regulations and practices. The proper inquiry, as we have explained, should focus on how the substance of the historical examples compares to § 922(g)(1).

4. If the district court's historical inquiry identifies analogous laws, do those laws supply enough of a historical tradition (as opposed to isolated instances of regulation) to support § 922(g)(1)? On this front, the parties should provide details about the enforcement, impact, or judicial scrutiny of these laws, to the extent possible.

5. If history supports Atkinson's call for individualized assessments or for a distinction between violent and non-violent felonies, how do we define a non-violent or a non-dangerous felony? And what evidence can a court consider in assessing whether a particular felony conviction was violent? For instance, can a court consider the felony conviction itself, the facts of the underlying crime, or sentencing enhancements? *Bruen* shows that these distinctions should also have firm historical support. See 142 S. Ct. at 2132–33 (explaining that the court must assess whether modern and historical regulations are "relevantly similar," including in terms of how and why the regulations burden gun rights).

Id. (quoting Bruen, 142 S. Ct. at 2131-33).

The Atkinson court "recognize[d] that asking these questions is easier than answering them." Id. at 1024. It also acknowledged that "the historical analysis required by *Bruen* will be difficult and no doubt yield some measure of indeterminacy," and that "[t]he parties may be unable altogether to find answers to certain questions, may find incomplete information in response to others, and perhaps in some instances may identify substantial historical information pertinent to one or another dimension of the required inquiry." Id.

48

But the Seventh Circuit explained that "the district court may accept amicus briefs to assist with its inquiry and, of course, may benefit from recent decisions from other courts and indeed the analysis embodied in our dissenting colleague's opinion." Id. That said, the Atkinson court concluded that "the district court (and surely us too, when this case or another one like it returns) will have to give the best answer available to whether the government has carried its burden of 'affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'" Id. (quoting Bruen, 142 S. Ct. at 2127).

C.      Whether Bruen Created Dual Standards

The defendant asserts that Bruen created distinct, separate standards for analyzing the "historical tradition" prong: one that applies to regulations that address "a general societal problem that has persisted since the 18th century" and another that applies to regulations that address "unprecedented societal concerns or dramatic technological changes." Dkt. Nos. 63 at 6-7, 69 at 3. The defendant contends that when a "challenged regulation addresses a general societal problem that has persisted since the 18th century," the government must cite evidence of a "distinctly similar historical regulation addressing that problem" to demonstrate that the regulation is constitutional. Dkt. No. 63 at 3-4 (quoting Bruen, 142 S. Ct. at 2129). He maintains that when a challenged regulation addresses an "unprecedented societal concerns or dramatic technological changes," the court may apply a "relevantly similar" standard, which the defendant describes as "less exacting" than the "distinctly

49

similar" standard; the defendant views the "relevantly similar" standard as less stringent because he believes it allows for analogical reasoning. Dkt. Nos. 63 at 9, 69 at 3-4 (citing Bruen, 142 S. Ct. at 2132).

It is not clear to this court that the Supreme Court created separate standards for analyzing the historical tradition prong. Though some federal courts have adopted this dual standard approach, others appear to have assumed that there is a single standard. Compare Daniels, 77 F.4th at 342-43 (observing that "Bruen helpfully gave us two conceptual pathways[]" and that which pathway a court employs "depends on whether [the challenged regulation] 'addresses a general societal problem that has persisted since the 18th century' or an 'unprecedented societal concern[ ]' that the Founding generation did not experience") with Jackson, 69 F.4th at 505-06 (determining that §922(g)(1) "is consistent with the Nation's historical tradition of firearm regulation" after effectively applying the "relevantly similar" standard, without discussing a "distinctly similar" standard).

The Seventh Circuit has not yet been presented with the opportunity to opine on this issue, but its decision in Bevis (in which it upheld firearm restrictions in the Protect Illinois Communities Act) suggests that it may not recognize dual standards. Bevis, 85 F.4th at 1191-92. In Bevis, the Seventh Circuit observed that the Bruen Court had "predicted that [the historical tradition] step would be relatively easy in some instances, when historical analogues are easy to find[,] [b]ut in other instances, it recognized that the task would be challenging." Id. at 1191. The court explained that Bruen had

50

"singled out 'cases implicating unprecedented societal concerns or dramatic technological changes,' which 'may require a more nuanced approach.'" Id. The Seventh Circuit did not state that the historical tradition prong may call for a "distinctly similar" standard in some cases but a "relevantly similar" standard in others. Id. Without recognizing any distinction based on the "problem" addressed by a given regulation, the Seventh Circuit stated that "the search is for a historical regulation that is *relevantly similar*, not identical." Id. (emphasis in original). It explained that, "[b]earing in mind that 'the central component' of the Second Amendment right is individual self-defense, the question is whether the modern and historical regulations 'impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified[.]'" Id. at 1191-92 (quoting Bruen, 142 S. Ct. at 2133). According to the Seventh Circuit, the Bruen Court "made it clear that this search was a meaningful one, not just a subterfuge for either upholding or striking down all modern laws[.]" Id. at 1192 The appellate court quoted Bruen's instruction that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." Id. (quoting Bruen, 142 S. Ct. at 2133) (emphasis in original). Although the Bevis court did not explicitly reject the dual standard approach espoused by the defendant in this case, its description of the Bruen framework as a "search . . . for a historical regulation that is *relevantly similar*," without mentioning a "distinctly similar" standard, implies that it would not recognize dual standards and that it sees

51

only a single standard—"relevantly similar" standard. Id. at 1191-92 (emphasis in original).

That said, in an abundance of caution, the court will analyze the defendant's challenge under both a "distinctly similar" and the "relevantly similar" standards.

### D.   The Defendant's Facial Challenge

Whether applying a "distinctly similar" (as described by the defendant) or the "relevantly similar" standard, the government has satisfied its burden to show that §922(g)(1) is facially constitutional because it "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." Bruen, 142 S. Ct. at 2127.

### 1.   *"Distinctly Similar" Standard*

The "distinctly similar" standard—to the extent that the court can separate it from the "relevantly similar" standard—does not appear as "exacting" as the defendant argues. Dkt. No. 63 at 7-9. The phrase "distinctly similar" appears in the Bruen decision a single time, in the following paragraph:

> The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding. In some cases, that inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that problem *is relevant evidence* that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also *could be evidence* that a modern regulation is unconstitutional.

52

> And if some jurisdictions actually attempted to enact analogous
> regulations during this timeframe, but those proposals were rejected
> on constitutional grounds, that rejection surely would provide *some
> probative evidence* of unconstitutionality.

142 S. Ct. at 2131 (emphasis added). The court sees no indication that the

Court intended the statements—describing what "is relevant evidence" or what

"could be evidence"—to establish a heightened, or different, evidentiary burden.

See United States v. Calhoun, Case No. 22-CR-00025, 2024 WL 36977, at *9

(N.D. Ill. Jan. 3, 2024) ("Even in the straightforward case, the absence of

distinctly similar historical regulation is merely 'relevant evidence' of

unconstitutionality, not dispositive evidence." (quoting Bruen, 142 S. Ct. at

2131)). Rather, "*Bruen*'s discussion of 'distinct' and 'relevant' similarity seems

aimed at interpreting historical silence." Daniels, 77 F.4th at 344. As the Fifth

Circuit, which has concluded that Bruen articulated dual standards, has

explained:

> [W]hen the historical record reveals no regulations of a particular
> kind, we could interpret that silence in one of two ways. *We could
> say that it means nothing (i.e., neither approval nor disapproval), or
> we could count silence as evidence that the public did not approve of
> such a regulation. Bruen* says we should make the latter inference,
> at least when the public experienced the harm the modern-day
> regulation attempts to address. *Bruen*, 142 S. Ct. at 2131. By
> contrast, when the ratifying public did not confront a particular
> harm, its failure to regulate it says little about whether it approved
> such regulation.

Id. (emphasis added).

If the Bruen Court intended to create a heightened "distinctly similar"

standard, it could have held that historical silence on a general societal

problem is "dispositive" or that it "carries significant weight." It did not do so.

53

The <u>Bruen</u> Court stated only that historical silence "is relevant," and instructed courts to "consider whether 'historical precedent' from before, during, and even after founding *evinces a comparable tradition of regulation*." <u>Bruen</u>, 142 S. Ct. at 2131-32 (emphasis added). Even applying a "distinctly similar" standard, the government is not required to present evidence of a historical twin to meet its burden. See <u>Calhoun</u>, 2024 WL 36977, at *10 (noting that "even when the general societal concern addressed by the challenged regulation also existed in the Founding era, the question to be answered is whether the regulation is consistent with the nation's historical tradition of firearms regulation" and that "[t]he lack of 'distinctly similar' historical regulation is relevant to that question, but it is not dispositive and does not obviate the analogical inquiry described in *Bruen*").

The government presented several examples from before and around the founding era that demonstrated how felons were treated following sentencing and how this treatment affected their right to bear arms. Dkt. No. 61 at 14-16. The government explained that the standard penalty for a felony was death, and that this punishment extended even to non-violent felonies. <u>Id.</u> at 14; <u>see also</u> <u>Medina</u>, 913 F.3d at 158 (noting that "[c]apital punishment for felonies was ubiquitous in the late Eighteenth Century and was the standard penalty for all serious crimes[,]" and that "nonviolent crimes such as forgery and horse theft were capital offenses" (internal quotation marks and citations omitted)). Even when felons did not receive the death penalty, English law and some states' laws imposed "an extinction of civil rights, more or less complete, which

54

was denominated civil death." Avery v. Everett, 110 N.Y. 317, 324 (N.Y. 1888);

see also Deming, 10 Johns. at 233 (discussing the effect of a pardon on a

felon's "civil death"); 4 Blackstone, COMMENTARIES *374. A felon considered

"civilly dead" did not have "the right to vote, to sit as a juror, to bear arms, to

marry, [or] hold office[.]" Avery, 110 N.Y. at 335 (Earl, J., dissenting). Felons

also were potentially subject "to the complete forfeiture of their estates or their

goods and chattels," which included their firearms. Dkt. No. 61 at 14; see also

4 Blackstone, COMMENTARIES *379-82 (detailing the grounds for forfeiture in

England before the founding); Colgan, 102 CAL. L. REV. at 332 nn. 275-76

(collecting early state statutes authorizing forfeiture for particular offenses)). As

the government recounted, England and some states enacted laws disarming

persons who had committed certain offenses that did not rise to the felony

level. Dkt. No. 61 at 15 (citing 4 Blackstone, COMMENTARIES *55; 3 Jac. 1, c. 5,

§16 (1605) (Eng.); "Dale's Laws" and the Non-Common Law Origins of Criminal

Justice in Virginia, 26 AM. J. LEGAL HIST. 354, 371 (1982); The Public Records of

the Colony of Connecticut From May, 1775 to June, 1776, at 193 (Charles J.

Hoadly ed., 1890)); see also Jackson, 69 F.4th at 503 (noting that "[e]arly

legislatures also ordered forfeiture of firearms by persons who committed non-

violent hunting offenses").

The government's examples "evince[] a comparable tradition of

regulation" as §922(g)(1). See Bruen, 142 S. Ct. at 2131. Generally, laws from

before and around the founding "authorized punishments that subsumed

disarmament—death or forfeiture of a perpetrator's entire estate—[even] for

55

non-violent offenses involving deceit and wrongful taking of property." <u>Jackson</u>, 69 F.4th at 503. Because these penalties subsumed disarmament, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." <u>Medina</u>, 913 F.3d at 158; <u>see also</u> <u>United States v. Hardy</u>, Case No. 23 CR 129, 2023 WL 6795591, at *6 (N.D. Ill. Oct. 13, 2023) ("[C]ommon sense dictates that firearm dispossession for felons is a 'comparable burden on the right of armed self-defense' when the historical alternatives were death or surrendering one's assets."); <u>United States v. Gates</u>, Case No. 22-CR-00397-1, 2023 WL 5748362, at *8 (N.D. Ill. Sept. 6, 2023) ("[I]t makes sense that these extensive and exhaustive penalties for felonies—outright capital punishment and the forfeiture of all property—qualify as powerful evidence that mere firearms dispossession of felons is a 'comparable burden,' as *Bruen* frames the standard, to historical punishments for felonies." (citation omitted)). These historical examples demonstrate that laws from before and around the founding supported disarming those convicted of a felony, often through implementing severe measures like the death penalty or complete forfeiture of their property. <u>See</u> <u>Johnson</u>, 2023 WL 7284848, at *5 ("As one commentator puts it, 'The framers could not have intended Second Amendment guarantees to apply to felons if, as a rule, all the felons were dead.'" (quoting Dru Stevenson, *In Defense of Felon-in-Possession Laws*, 43 CARDOZO L. REV. 1573, 1587 (2022))).

While these consequences for a felony conviction are not identical to those imposed by §922(g)(1)—such as prohibiting felons from possessing firearms even after they completed their sentence—they are "distinctly similar" to §922(g)(1). The common application of the death penalty in felony cases led to all felons who were executed being permanently disarmed. Bucklew v. Precythe, 139 S. Ct. 1112, 1122 (2019) ("[D]eath was the standard penalty for all serious crimes at the time of the founding." (internal quotation marks and citation omitted)); see also Range, 69 F.4th at 126-27 (Krause, J., dissenting) ("[T]he ubiquity of the death penalty suggests that the Founding generation would have had no objection to imposing on felons the comparatively lenient penalty of disarmament."). Felons lucky enough to escape execution nonetheless faced the complete forfeiture of their estates, including their firearms, even for non-violent offenses. See Range, 69 F.4th at 127 (Krause, J., dissenting) (observing that "[e]ven some non-capital offenses triggered the permanent loss of an offender's estate, including any firearms" and collecting statutes); 2 Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788) 261 (1886) (1786 N.Y. Law) (providing that a counterfeiter "shall be guilty of felony, and being thereof convicted, shall forfeit all his or her estate both real and personal to the people of this State, and be committed to the [correction house] of the city of New York for life, and there confined to hard labor"). Individuals who committed less serious crimes also lost their firearms on a temporary, if not permanent, basis. See Range, 69 F.4th at 127 (Krause, J., dissenting) (collecting statutes); see also Jackson, 69

57

F.4th at 503 (noting that "[e]arly legislatures [] ordered forfeiture of firearms by persons who committed non-violent hunting offenses"). This framework of regulations creates a prohibition on the use of firearms "distinctly similar" to that of §922(g)(1) because it had effectively the same result. See United States v. Johnson, Case No. 18 CR 00458, 2023 WL 6690388, at *6 (N.D. Ill. Oct. 12, 2023) (noting that, "[t]hough not explicitly mentioning disarmament, sentences such as the death penalty and total forfeiture of one's land and possessions (which would include firearms) assume that one would lose the ability keep and bear firearms[,]" and that "the practical upshot of such laws is 'distinctly similar' in that they resulted in disarmament").

The defendant focuses his argument on the subset of felons who were not sentenced to death or lifetime imprisonment. He argues that this subset of felons was "stripped of [their] then-existing estate, including any firearms," but could "presumably repurchase arms" "upon successfully serving [their] sentence and reintegrating into society." Range, 69 F.4th at 127-28 (Krause, J., dissenting) (emphasis added). The defendant implies the burden faced by felons like himself is more severe, because in most instances it imposes a permanent ban on a felon's ability to possess firearms. But as Judge Dries observed, §922(g)(1)'s "prohibition on possessing a firearm or ammunition is not necessarily permanent." Dkt. No. 68 at 12; see also United States v. Washington, Case No. 23-CR-00274, 2023 WL 8258654, at *7 (N.D. Ill. Nov. 29, 2023) (rejecting "the characterization of Section 922(g)(1) as having no exceptions" and explaining various circumstances that would allow a felon to

58

possess a firearm). Convictions that have been expunged or set aside or for which a person has been pardoned or had civil rights restored do not result in any restriction on the right to keep and bear arms. See 18 U.S.C. § 921(a)(20). As Judge Dries pointed out, although Congress has not funded it, the statute provides a mechanism to restore a convicted felon's gun rights. See 18 U.S.C. §925. Section 922(g)(1) arguably imposes a burden on today's felons that is comparable to founding-era regulations imposed on even those felons who were not sentenced to death or lifetime imprisonment.

The government has presented "distinctly similar" laws from before and around the founding, which "evince[] a comparable tradition of regulation" as §922(g)(1). See Bruen, 142 S. Ct. at 2131. The court concludes that §922(g)(1) "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms" and is facially constitutional under the "distinctly similar" standard. Id. at 2127. This conclusion is bolstered when the court applies the "relevantly similar" standard, which is the only standard the Seventh Circuit acknowledged in Bevis. 85 F.4th at 1191.

2.     "Relevantly Similar" Standard

The government presented several category-based restrictions from before and around the founding era that are "relevantly similar" to §922(g)(1). These category-based restrictions disarmed certain groups—Catholics, Native Americans, Black people and those who refused to swear loyalty to the new government—whom authorities believed could not be trusted to adhere to the rule of law. Dkt. No. 61 at 16-23. These status-based restrictions disarmed

59

significant numbers of people, without consideration of their individual dangerousness or criminal history. See Jackson, 69 F.4th at 504 (observing that "[n]ot all persons disarmed under historical precedents—not all Protestants or Catholics in England, not all Native Americans, not all Catholics in Maryland, not all early Americans who declined to swear an oath of loyalty— were violent or dangerous persons" and yet they were disarmed nonetheless). These laws may be "characterized as restrictions on persons who deviated from legal norms or persons who [lawmakers at the time believed] presented an unacceptable risk of dangerousness[.]" Id. at 505.

As the Jackson court conceded, many of these categorical prohibitions would be considered "impermissible today under other constitutional provisions." Jackson, 69 F.4th at 504. But "they are relevant here in determining the historical understanding of the right to keep and bear arms." Id.; see also Atkinson, 70 F.4th at 1035 (Wood, J., dissenting) ("Though some of those laws would no longer pass muster under the Equal Protection Clause, they reveal conclusively the scope of governmental power that was understood to exist at the time the Second Amendment was adopted."). This is because the Bruen Court instructed lower courts to consider "'historical precedent' . . . from before, during, and even after the founding." Bruen, 142 S. Ct. at 2131. By focusing on the liberties afforded before and around the founding, Bruen by necessity draws attention to the nation's history of deprivations of those same liberties. As Judge Adelman reasoned in Johnson, "[s]urely the Bruen Court knew that in rummaging through founding-era provisions judges would

60

encounter odious racism, sexism, and religious bigotry; nothing in <u>Bruen</u> suggests that historical analogues cannot be considered just because they offend modern sensibilities." <u>Johnson</u>, 2023 WL 7284848, at *7. The court does not condone these historical categorical restrictions, but application of the <u>Bruen</u> analysis requires the court to consider them as relevant evidence of the historical underpinnings of Second Amendment.

Although these category-based restrictions may not be "a dead ringer" for §922(g)(1), they are "analogous enough to pass constitutional muster." <u>Bruen</u>, 142 S. Ct. at 2133. These restrictions are "relevantly similar" to §922(g)(1) because they impose a "comparable burden on the right of armed self-defense" and are "comparably justified[.]" <u>Id.</u> at 2132-33 (declining to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment" but noting "that <u>Heller</u> and <u>McDonald</u> point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense").

As to the burden imposed, the category-based restrictions identified by the government and §922(g)(1) both prohibit specific groups from owning, purchasing or possessing a firearm. The court disagrees with the defendant's claim that "each of the government's proffered analogues w[ere] significantly less burdensome on the right to bear arms than the total and permanent firearm ban set out in Section 922(g)(1)[]" because "[n]ot one of the laws cited by the government imposed a total, permanent ban on firearms possession." Dkt. No. 63 at 12. As discussed above, §922(g)(1)'s "prohibition on possessing a

61

firearm or ammunition is not necessarily permanent." Dkt. No. 68 at 12; see also Washington, 2023 WL 8258654, at *7. Persons convicted of felonies have at least the potential of restoration of their right to bear arms. The option to restore, or even initially have, a right to bear arms was not afforded to many of the racial and religious minorities disarmed by the category-based restrictions. For example, before and around the time of the country's founding, Black people were prohibited from possessing firearms due to the immutable characteristic of their skin color, whether they were free or enslaved. Adam Wikinkler, *Racist Gun Laws and the Second Amendment*, 135 HARV. L. REV. F. 537, 537 (2022). This type of category-based restriction denied any member of the group the right to bear arms, even if there was no showing that the group member had been deemed "violent" or "dangerous." See Jackson, 69 F.4th at 504 (observing that "[n]ot all persons disarmed under historical precedents . . . were violent or dangerous persons" and concluding that "history demonstrates that there is no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons"). The category-based restrictions and §922(g)(1) imposed a "comparable burden on the right of armed self-defense," Bruen, 142 S.Ct. at 2132-33, because they disarmed entire groups of people with no evaluation of each individual member's risk for violence.

As to the justification, the category-based restrictions and §922(g)(1) can be "characterized as restrictions on persons who deviated from legal norms or persons who [lawmakers at the time believed] presented an unacceptable risk

of dangerousness[.]" <u>Jackson</u>, 69 F.4th at 505. The historic record before the court "reveals that, since the founding, governments have been understood to have the power to single out categories of persons who will face total disarmament based on the [perceived] danger they pose to the political community if armed." <u>Atkinson</u>, 70 F.4th at 1035 (Wood, J., dissenting); <u>see also</u> <u>Jackson</u>, 69 F.4th at 504 ("Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed.") "Section 922(g)(1) does precisely what statutes have been doing since the mid-18th century[;] [i]t identifies the group of persons deemed dangerous to the political community— those convicted of the defined felonies—and it makes it unlawful for them to possess a firearm." <u>Atkinson</u>, 70 F.4th at 1035 (Wood, J., dissenting). The category-based restrictions and §922(g)(1) are based on a comparable justification. <u>Bruen</u>, 142 S.Ct. at 2132-33,

The government has identified "relevantly similar" laws from before and around the time of the country's founding, which "impose[d] a comparable burden on the right of armed self-defense" and "that burden is comparably justified[.]" <u>Bruen</u>, 142 S. Ct. at 2133. These laws—discriminatory as they were—demonstrate "that legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms." <u>Jackson</u>, 69 F.4th at 505; <u>see also</u> <u>Watson</u>, 2023 WL 6623774, at *5 ("Modern laws prohibiting felons from possessing firearms are analogous but far more reasonable and just than the early English and revolutionary period laws that

63

prohibited religious minorities or Native Americans from doing so."). Section 922(g)(1) "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms" and is facially constitutional under the "relevantly similar" standard. Bruen, 142 S. Ct. at 2127.

E.    The Defendant's As-Applied Challenge

The defendant argues that §922(g)(1) is unconstitutional as applied to "non-violent offenders like [him]." Dkt. No. 56 at 4-5. Given some of the category-based restrictions the court discussed in the earlier paragraph, it would not have mattered at and around the time of the founding of the country whether a person was "violent" if that person belonged to a particular category.

Nor is it clear that the constitutionality of §922(g)(1) turns on an individualized assessment of the particular felony or the determination of whether the particular felon is deemed "violent." Compare Range, 69 F.4th at 98, 107 (holding §922(g)(1) unconstitutional as applied to a person convicted of "making a false statement to obtain food stamps in violation of Pennsylvania law") with Jackson, 69 F.4th at 504 ("[H]istory demonstrates that there is no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons."). Prior to Bruen, the Seventh Circuit "repeatedly rejected as-applied Second Amendment challenges to § 922(g)." Kanter, 919 F.3d at 443. After Bruen, the Seventh Circuit in Atkinson seemed open to an as-applied challenge to §922(g)(1) but required Atkinson to "provide [a] historical basis for individualized assessments or for delineating between individuals who committed violent versus non-violent crimes." 70 F.4th at

64

1023-24. And in <u>Gay</u>, the court assumed for the sake of argument that there was "*some* room" for as-applied challenges, but emphatically rejected the argument that someone on parole, with twenty-two felony convictions (one of which was for battery to a peace officer) and who fled police, was the type of "law-abiding, responsible" person whom the Supreme Court had described as having the right to possess firearms. <u>Gay</u>, 98 F. 4th at 846-47.

Even if the constitutionality of §922(g)(1) can turn on individualized assessments of a person's dangerousness or violence, the defendant has not identified historical evidence regarding "what the Founders would have viewed as a 'violent' crime and what evidence they would consider in making that determination." <u>Atkinson</u>, 70 F.4th at 1024. The defendant asserts that he is a "non-violent offender" because "[n]one of the statutes [he] was convicted of violating includes an element of force, attempted use of force, or threatened use of force against the person or property of another." Dkt. No. 56 at 2, 4-5. That argument implies that the court should use an elements-only test in determining whether a particular defendant should be deemed "violent." The defendant has identified no historical precedent for the proposition that courts should look to the elements of the felony charge or charges of conviction to determine whether someone is a "non-violent offender," and has identified no evidence regarding whether the Founders would have considered the elements of a person's felony conviction in determining whether the person was a "non-violent offender." <u>See</u> <u>Atkinson</u>, 70 F.4th at 1024 ("Nor does Atkinson tell us

65

what the Founders would have viewed as a 'violent' crime and what evidence they would consider in making that determination.").

An elements-only test does not take into account conduct that the Seventh Circuit in Gay found relevant to the question of whether Gay was a "law-abiding, responsible" person (in the words of the Bruen Court). The Seventh Circuit referenced the fact that Gay had spent twenty-five years in prison, had been on parole and had fled police to conclude that he was *not* such a "law-abiding, responsible" person. The defendant has provided scant information about his own criminal history. He has emphasized the age and nature of his drug convictions, but one of his convictions was for fleeing. He provides no details about the facts that gave rise to that conviction (which, in addition to the elements-only test he implies is appropriate, could be another way for courts to gauge whether someone is a "non-violent offender," and might have been a way persons in the time of the country's founding would have made that determination). The defendant asks the court to make an individualized determination about whether §922(g)(1) is unconstitutional as applied to him while providing next to no information about himself from which the court could make such a determination.

The defendant relies heavily on the Third Circuit's decision in Range. He acknowledges that the Range court emphasized that its decision was "narrow," but argues that "it is clear that the reasoning of the opinion is more broadly applicable." Dkt. No. 56 at 12 (citing Range, 69 F.4th at 104-05). The defendant quotes the Range dissent in saying "that 'the analytical framework [the majority

66

has] applied to reach their conclusion renders most, if not all, felon bans unconstitutional.'" Id. (quoting Range, 69 F.4th at 113 (J. Shwartz, dissenting)). He encourages this court to "apply that same analytical framework, which leads to the conclusion that, under the Supreme Court's 'text and tradition' approach to the Second Amendment, Section 922(g)(1) is unconstitutional both facially and as applied to [him]." Id.

As the defendant concedes, the Range court issued what it described as a "narrow" decision because the court made its ruling in Range's *civil* lawsuit seeking a declaratory judgment. Id. The Third Circuit held §922(g)(1) unconstitutional "only" as applied to Range, who was barred from possessing a firearm due to his 1995 conviction for making a false statement on his food stamp application. Id. at 98-99. Even though this offense was classified as a misdemeanor, the conviction triggered §922(g)(1) because it was punishable by up to five years' imprisonment. Id. at 98. The Third Circuit dismissed the government's historical evidence of status-based restrictions, stating that "[a]part from the fact that those restrictions based on race and religion now would be unconstitutional under the First and Fourteenth Amendments, the Government does not successfully analogize those groups to Range and his individual circumstances." Id. at 104-05. The Range court concluded that "[b]ecause the Government has not shown that our Republic has a longstanding history and tradition of depriving people *like Range* of their firearms, §922(g)(1) cannot constitutionally strip him of his Second Amendment rights." Id. 106 (emphasis added).

67

The dissent in Range pointed out that the majority "never specifie[d] . . . the respects in which an offender must be 'like Range' to preclude the application of § 922(g)(1)." Id. at 132 (Krause, J., dissenting); see also Johnson, 2023 WL 7284848 at *7 (finding the Range decision unpersuasive because it "never really specified what makes a person 'like Range' . . . [and] instead cit[ed] a variety of sympathetic circumstances: Range's non-violent predicate offense, the mitigated nature of his crime, his probationary sentence, his law-abiding life post-conviction, and his reason(s) for wanting a gun"). This court does not know what would make a person "like Range" for the purposes of §922(g)(1), but the defendant likely would not meet that standard. If to be "like Range" means to be a person who was convicted twenty-eight years earlier of a misdemeanor that happened to carry a penalty of more than a year in prison, the defendant is not "like Range." He had five prior felony convictions before the date of the charged offenses—one only three years or so earlier. If to be "like Range" means to be someone who files a declaratory civil lawsuit seeking to reinstate his right to possess firearms, the defendant is not "like Range." He has raised his as-applied challenge in the context of a federal, criminal prosecution in which he is alleged to have violated §922(g)(1) (rather than pro-actively seeking a determination of the law's constitutionality before taking the action that caused him to be charge with its violation).

The defendant has not "provide[d] [a] historical basis for individualized assessments or for delineating between individuals who committed violent versus non-violent crimes." Atkinson, 70 F.4th at 1023-24. Even if he had, the

68

defendant has not demonstrated that §922(g)(1) is unconstitutional as applied to him.

## IV. Conclusion

With this decision, every district court and magistrate judge in the Eastern District of Wisconsin has ruled that §922(g)(1) passes constitutional muster. United States v. Neal, Case No. 23-cr-0141-bhl, 2024 WL 1794424 (E.D. Wis. April 25, 2024) (Ludwig, J.); United States v. Davis, Case No. 22-cr-210-JPS, 2024 WL 490581 (E.D. Wis. Feb. 8, 2024) (Stadtmueller, J.); United States v. Johnson, Case No. 22-cr-254, 2023 WL 7284848 (E.D. Wis. Nov. 3, 2023) (Adelman, J.); United States v. Watson, Case No. 23-cr-109, 2023WL6623774 (E.D. Wis. Oct. 11, 2023) (Griesbach, J.). See also, *e.g.*, United States v. Davis, Case No. 22-cr-189, Dkt. No. 31 (E.D. Wis. Feb. 27, 2023) (Dries, M.J.); United States v. Washington, Case No. 23-cr-35, Dkt. No. 41 (E.D. Wis. Sept. 15, 2023) (Joseph, M.J.); United States v. Denruyter, Case No. 23-cr-155, Dkt. No. 15 (E.D. Wis. Oct. 17, 2023) (Duffin, M.J.). In his arguments to Judge Dries, the defendant dismissed the weight of authority against his position, asserting that his constitutional challenge was not a sporting match with the win going to the side with the most points. That is true. But the fact that eight judges of varying experience and tenure, considering different sets of facts, have uniformly rejected the arguments the defendant has presented demonstrates that unless and until the Seventh Circuit or the United States Supreme Court decides differently, the judges in

the Eastern District of Wisconsin will rule consistently on similar challenges in the future.

The court **OVERRULES** the defendant's objections to Judge Dries's report and recommendation. Dkt. No. 69.

The court **ADOPTS** Judge Dries's recommendation. Dkt. No. 68.

The court **DENIES** the defendant's motion to dismiss Count Four. Dkt. No. 56.

The court will separately communicate with the parties regarding the next steps in the litigation.

Dated in Milwaukee, Wisconsin this 14th day of June, 2024.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**